## COMMONWEALTH *vs.* CHRISTOPHER BRADFORD.

No. 99-P-764.

Middlesex. April 2, 2001. - August 2, 2001.

Present: BROWN, CYPHER, & GRASSO, JJ.

*Practice, Criminal,* Argument by prosecutor. *Witness,* Credibility.

At a murder trial, the prosecutor's conduct in briefly sitting in the witness chair during closing argument and repeating a portion of the witness's testimony, although inappropriate, did not amount to vouching for the credibility of the principal Commonwealth witness and did not create a substantial risk of a miscarriage of justice, where testimony by other witnesses corroborated details of the principal witness's testimony, where there was strong evidence of the defendant's consciousness of guilt, and where the judge instructed the jury that closing arguments are not evidence. [222-224]

INDICTMENT found and returned in the Superior Court Department on October 31, 1995.

The case was tried before *Robert Malcolm Graham,* J.

*Roger A. Cox* for the defendant.

*Eileen M. O'Brien,* Special Assistant District Attorney, for the Commonwealth.

CYPHER, J. The defendant appeals from his conviction by a jury of murder in the second degree, claiming that the prosecutor improperly vouched for the credibility of the principal Commonwealth witness during closing argument when he sat in the witness chair and repeated a portion of the witness's testimony. We conclude that the prosecutor's conduct, although inappropriate, did not amount to vouching for the witness's credibility.[1]

---

[1]The defendant seeks review under the prejudicial error standard, but defense counsel did not object when the prosecutor assumed the witness stand. After the jury charge, the judge called the lawyers to the sidebar. Defense counsel objected to the prosecutor having taken the witness stand and suggested that the judge use his discretion in deciding whether to give a cura-

*Factual background.* A detailed recitation of the facts is necessary properly to place the defendant's argument in context.

Aaron Sutton, the Commonwealth's principal witness, testified that, on Thursday night, August 24, 1994, at approximately 11:30 P.M., he and Reginald Boon received a ride in a van from Lisa Valente. She drove them to Beaver Park, Framingham, where they were hoping to meet an acquaintance named Lee from whom they planned to purchase drugs. Also in the van were James Clark and Derek Gemma. At Beaver Park, Valente stopped the van across the street from Lee's apartment, and Sutton went to the door. Lee was not home.

While walking back to the van, Sutton saw Willie Diaz with several other people, including the defendant, in a grassy courtyard between apartments. Sutton called Diaz over and asked him if he had seen Lee. While Sutton was speaking with Diaz, Boon got out of the van and walked toward them. An argument developed between Boon and the defendant. The defendant pulled out a gun and shot Boon. Boon fell to the ground, and everyone ran.

Later that night, Sutton told his mother what had happened. At trial, Sutton's mother corroborated that she had been awakened in the early morning by her son and that he appeared very upset. He told her that "Chris" had just shot "Reggie."[2]

The police interviewed the defendant on Sunday, August 27. After reading the defendant his Miranda rights and explaining that they were investigating the murder that had occurred on Thursday night, the defendant immediately volunteered, "I was in Worcester on Thursday evening and I can prove it." The defendant claimed that he went to a club in Worcester with two friends named Kerry Faircloth and Jose Villafane, and that, at

---

tive instruction. The judge did not give a curative instruction, stating only (to the attorneys), "[a]nd I assume that will be the last time I ever see a lawyer take a witness stand in a closing in any case that I have."

Such a late objection and equivocal request for a curative instruction limit review to the "substantial risk of a miscarriage of justice" standard. *Commonwealth* v. *Shea*, 401 Mass. 731, 736-737 (1988) (defendant was not entitled to review as of right where defense counsel did not object to closing until after the jury charge).

[2]The defendant's objection to some of this testimony was overruled. No claim of error is made on appeal.

around 1:00 A.M., they returned to Framingham. When they reached Beaver Park Road they learned that a "a black guy had been shot."

At first, Faircloth and Villafane confirmed the defendant's alibi. Later, however, Faircloth admitted to police that she had not seen the defendant that night and had lied at Villafane's request. Villafane continued to maintain that he and Faircloth were with the defendant in Worcester. After the police charged Villafane with being an accessory after the fact, however, he changed his story. Villafane received a letter of non-prosecution from the district attorney, and Villafane testified that he and Faircloth were not with the defendant on Thursday night and that the defendant had asked him to lie.

For the defense, a witness testified that on the night of the shooting she had seen Sutton at 5:30 P.M. and then saw him again later, after a gunshot was fired, running with a gun in his hand.[3] Another witness testified that he had seen Sutton with a gun months before the shooting and had seen him on the night of the shooting but did not notice anything unusual.

*Discussion.* The theory of the defense was that Sutton shot Boon and then framed the defendant to protect himself. Along that line, defense counsel asked Sutton a question during cross-examination which suggested that Sutton had fabricated the accusation against the defendant:

> "And that's when you told [the police] that Chris — 'this kid Chris, I don't know his last name, he was with Willie, I don't know his last name, and I saw him shoot Reginald Boon,' right?"

Sutton responded: "Truth is the truth."

In closing argument, defense counsel concentrated most of his argument on Sutton's credibility. The prosecutor also spent a significant portion of his time in closing argument on Sutton's credibility, rebutting defense counsel's argument and emphasizing why Sutton was believable. After focusing on defense counsel's claim that Sutton was not credible because he could

---

[3]In rebuttal, the Commonwealth introduced Sutton's work record, which corroborated Sutton's testimony that he had worked until 5:45 P.M. on the night of the shooting.

not remember what the defendant was wearing on the night of the killing, the prosecutor took the witness stand[4] and continued:

> "Aaron Sutton, you know, 'Clothes?' The most telling part of this trial was not on direct examination, was not when I was questioning Aaron Sutton. It's the fifth time he's testifying in this matter. It's when Mr. Kelly is cross-examining him and asking him questions, you know, like, 'What is he wearing? Where were you were [*sic*]? [W]hat happened?' You know, 'You did this, didn't you?'
>
> "Finally, in a fit of frustration, Aaron Sutton says, Hey, the truth is the truth.' In the circumstances in which he said that, it was perfect, it was perfect because everybody was thinking the same thing. He was saying, in essence, from that stand, 'Hey, listen, there's nothing you can do, Mr. Defense Attorney. You can ask questions all day, you can't change the truth, and I can sit here all day and answer these questions, but I can't change the truth. 'The truth is the truth.' That tells you a lot about what happened here."

The defendant does not argue that the words used by the prosecutor amounted to vouching. Rather, the defendant claims that the act of sitting in the witness chair constituted improper vouching because it created an impression that the prosecutor believed Sutton.

Improper vouching consists of expressing a personal belief in the credibility of a witness or indicating that one possesses special knowledge from which the witness's credibility could be verified. *Commonwealth* v. *Thomas*, 401 Mass. 109, 115-116 (1987). It is unlikely that the jury so construed the prosecutor's conduct. The prosecutor was only briefly on the witness stand, and there was nothing in the prosecutor's language which suggested that he personally believed Sutton. See *Commonwealth* v. *Raymond*, 424 Mass. 382, 391 (1997).

Sitting in the witness chair in this context crossed the line of an acceptable "demonstration" and was inappropriate because it might have tended to blur the distinction between the roles of the trial participants. It did not, however, create a substantial

---

[4]The record does not clearly establish the exact moment the prosecutor took the witness stand or how long he remained there.

risk of a miscarriage of justice. Although Sutton's testimony was the cornerstone of the Commonwealth's case, testimony by other witnesses in the vicinity of the shooting corroborated details of his story, and there was strong evidence of the defendant's consciousness of guilt, specifically, his discredited alibi. Additionally, the judge instructed the jury that closing arguments are not evidence. *Commonwealth* v. *Quigley*, 391 Mass. 461, 464 (1984), cert. denied, 471 U.S. 1115 (1985). *Commonwealth* v. *Burns*, 49 Mass. App. Ct. 677, 682 (2000).

Notwithstanding our conclusion that the prosecutor did not vouch for the witness by sitting in the witness chair and did not by his conduct create a substantial risk of a miscarriage of justice, such a practice, by counsel for either party, is unacceptable.[5]

*Judgment affirmed.*

---

[5]We note also the words of Justice Lummus with respect to the duty of the trial judge, to be " 'the directing and controlling mind at the trial.' . . . He is there to see that justice is done . . . . The judge ought not to let the jury be diverted from the real issue. The skill [and conduct] of counsel must not be allowed to mislead the jury by raising false issues or by appeals to emotion or prejudice." Lummus, The Trial Judge 19-20 (1937), quoting from *Whitney* v. *Wellesley-Boston St. Ry.*, 197 Mass. 495, 502 (1908).