## Commonwealth vs. Patrick Molle.

No. 99-P-1623.

Middlesex. October 12, 2001. - December 4, 2002.

Present: Armstrong, C.J., Perretta, Greenberg, Mason, & Doerfer, JJ.[1]

*Rape. Indecent Assault and Battery. Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Evidence,* Intoxication, Fresh complaint.

At the trial of an indictment charging rape, the judge's instruction to the jury to consider the victim's intoxication in assessing her ability to consent to sexual intercourse, although incomplete and not warranted by the evidence, nevertheless did not give rise to a substantial risk of a miscarriage of justice, where the case against the defendant, particularly concerning his use of force, the victim's affirmative resistance, and his consciousness of guilt, was strong; where the instruction did not invite the jury to convict the defendant if they found that the victim had consumed any alcohol at all; and where the instruction, which consisted of only a single sentence, was not the central theme of the judge's charge, and was, in light of the theory of the defense, mere surplusage that could not have realistically have affected the jury's deliberations. [625-629] Greenberg, J., dissenting, with whom Doerfer, J., joined.

Statements made by a prosecutor in closing argument at a criminal trial did not give rise to a substantial risk of a miscarriage of justice, where the statements consisted of proper comment on the tactics and arguments of defense counsel, permissible argument that the defendant should be held accountable for his actions, and proper argument concerning the credibility of the Commonwealth's witnesses. [630-631]

Testimony by a police officer at a rape trial, summarizing in his own words what the victim had told him, constituted permissible fresh complaint testimony. [631-632]

Indictments found and returned in the Superior Court Department on October 1, 1997.

The cases were tried before *Sandra L. Hamlin*, J.

*William S. Smith* for the defendant.

[1]After circulation of the opinion to other Justices of the Appeals Court, the panel was expanded. See *Commonwealth* v. *Moreton*, 48 Mass. App. Ct. 215, 215 n.1 (1999).

*Jessica L. Langsam,* Assistant District Attorney, for the Commonwealth.

MASON, J. Following a jury trial in Superior Court, the defendant, Patrick Molle, was convicted of rape (G. L. c. 265, § 22[b]); indecent assault and battery on a person fourteen or older (G. L. c. 265, § 13H); and assault and battery (G. L. c. 265, § 13A).[2] On appeal, the defendant claims that (1) the judge improperly instructed the jury to consider the victim's intoxication in assessing her ability to consent; (2) the prosecutor made several improper statements during his closing argument; and (3) the judge admitted fresh complaint evidence that exceeded the scope of corroboration for the victim's testimony. We affirm the convictions.

*The trial.* The Commonwealth introduced the following evidence at trial. On August 5, 1997, the victim and her longtime friend and roommate, Paul Andrews, had a cookout at their apartment in Everett. Following the cookout, the victim left the apartment and drove around Everett for about an hour. At about 9:45 P.M., she pulled into the parking lot of Conrad's, a local pub. Once inside, the victim sat at the bar and ordered a beer. Fifteen or twenty minutes later, the defendant and his friend, who was initially introduced to the victim as "Jim" but later identified to her as Ralph, approached the victim and struck up a conversation. The victim thought that the defendant appeared to be "polite, clean cut," and in general, "fine, a nice person."

Early in the conversation, the defendant gave the victim his business card, and the discussion turned to the victim's line of work. The victim stated that she was a home health aide working with elderly patients. The defendant replied that he had a sick, elderly mother at home with whom he could use some assistance. Their talk then moved to other subjects. About an hour later, the defendant invited the victim to join him at a nearby club named the Chalet, and the victim agreed to do so. By the time she left Conrad's, the victim had consumed approximately two beers and a shot of hard liquor. She testified that she felt no effects from this alcohol.

At the Chalet, the defendant went to speak with some women

---

[2]The assault and battery conviction was placed on file without any objection from the defendant.

at the opposite end of the bar for ten or fifteen minutes. Meanwhile, the victim drank a glass of water and danced with "Jim." Thereafter, the victim ordered another beer, paying for it herself, and a shot of hard liquor. At about 12:30 or 12:45 A.M., the defendant returned to the topic of his mother and ultimately requested that the victim accompany him to his apartment to help him attend to his mother. The victim agreed to do so.

As the victim left the Chalet, the defendant insisted that "Jim" drive the victim's car to the defendant's apartment because the victim had consumed "a couple of drinks." The victim testified that, although she did not feel under the influence of alcohol, the defendant's persistence caused her to go along with this idea. After the two cars were parked behind the defendant's apartment building, "Jim" handed the keys to the victim's car to the defendant and left. The victim followed the defendant into the building.

Upon entering the defendant's apartment, the victim was surprised to discover that it consisted of a single room and that there was an unmade bed directly in front of her. There was no sign of the defendant's mother. Upon making these discoveries, the victim told the defendant that she wanted to leave. The defendant, however, became angry and pushed her onto the bed.

According to the victim's testimony, a struggle ensued during which the defendant called her a "tease," a "bitch," and a "whore." She testified that she kicked the defendant and he bit her on the neck. During the commotion, the defendant managed to put his hands under her shirt and touch her breasts. He then unzipped her pants, pushed them and her underwear down to her knees, and inserted his fingers into her vagina. The victim testified that she attempted to resist the defendant's actions, but was largely unsuccessful because the defendant was restraining her.

After the defendant had inserted his fingers into the victim's vagina, she was able to kick and push him onto the floor, at which point she leapt from the bed. She pulled up her pants and located her sneakers, one of which had fallen off during the struggle. She then grabbed her keys and purse and immediately fled the apartment. The defendant did not follow her out.

The victim went to her car and drove home. When she ar-

rived at her apartment around 3:30 A.M., she immediately took a shower and went into the living room, where she found Andrews asleep on the couch. As the victim sat at the foot of the couch and cried, Andrews awoke and tried to console her. Andrews testified that, while the victim appeared very upset, she did not appear to be under the influence of alcohol, and he did not smell alcohol on her breath. After a brief and broken conversation, the victim called the police.

Officers Tracy Lacey and Bernard Aspell responded to the call and arrived at the victim's apartment at about 4:30 A.M. The victim spoke with the officers for approximately fifteen minutes before leaving the apartment with them. The victim was shaking and sobbing. On cross-examination, Officer Lacey testified that when she and Officer Aspell responded to the victim's call in the early morning of August 6, she detected "a little smell of liquor on [the victim's] breath." Officer Lacey further testified, however, that in her opinion the victim was not having any difficulty in walking or communicating and was not drunk. Officer Aspell also testified that the victim "had some alcohol on her breath," but that "[s]he didn't appear drunk."

With Officer Aspell in one car and the victim and Officer Lacey in another, the three headed for the defendant's residence. Two other police officers, Detective Charles Marchese and Lieutenant John Flammia, met them in front of the defendant's building. The male officers then went to the apartment identified by the victim, and the defendant answered the door. When informed of the reason for the police presence at his apartment, the defendant insisted that they were mistaken since he had stayed inside all evening and had "witnesses" to that effect. Detective Marchese then brought the victim to view the defendant, and the victim identified the defendant as her assailant. Officer Aspell and Detective Marchese testified that the victim was visibly upset when she saw the defendant and that she backed against a wall, became extremely nervous, and shook.

The officers then brought the victim to the police station where she was further interviewed by Detective Marchese. During this interview, the victim was crying, disheveled, and upset. The victim told Detective Marchese that she had gone back to

the defendant's apartment to visit his ill mother and then, when she had asked to leave, the defendant had grabbed her and thrown her onto the bed. The victim further stated that, after touching her breast, the defendant had pulled down her pants and "stuck his fingers inside me." She also stated that, throughout the encounter, she was yelling, crying, and trying to fight off the defendant. Detective Marchese observed and photographed a red mark on the victim's neck. He also observed scratches on the victim's hand.

The defendant was arrested and given Miranda warnings. Following his arrest, the defendant again stated to Detective Marchese that he had remained in his apartment all evening and had "witnesses to it."

The next day, August 7, 1999, Officer Lacey met with the victim at her home. During this meeting, Officer Lacey observed that the victim had "bruising and marks continuously on her legs and arms as well as her neck." The bruises included "hand marks, like bruising" on her inner thigh. Officer Lacey took additional photographs of these injuries.

The defendant did not present any evidence at trial. His primary defense at trial was that the victim had actively solicited or participated in whatever incident had occurred, and his trial strategy was to raise doubts about the credibility of the victim.

1. *Unwarranted instruction.* The judge's instructions on rape contained the language drawn from G. L. c. 265, § 22(*b*), that required the jury to determine whether the sexual intercourse was accomplished "by force or by threat of bodily injury and against the victim's will." The judge then went on to instruct the jury that the lack of evidence of struggle or outcry by the victim or lack of evidence of force by the defendant did not mean that there was consent for intercourse because, in certain circumstances, physical resistance may not be possible. The judge then stated:

"If the victim is restrained from exercising her will due to fear, to alcohol, or other causes, there can be no consent. The victim is not required to use physical force to resist. Any resistance is enough when it demonstrates that the victim's lack of consent is honest and real."

626    56 Mass. App. Ct. 621 (2002)

Commonwealth *v.* Molle.

The defendant claims that the judge erred in instructing the jury that there could be no consent if the victim was restrained from exercising her will due to alcohol because there was no evidence that the victim was intoxicated or under the influence of alcohol at the time of the incident. The defendant further claims that, even though the instruction was not objected to, it gave rise to a substantial risk of a miscarriage of justice requiring reversal because it "created an alternative theory of guilt, namely that simply because there was evidence that [the victim] had *consumed* alcoholic drinks, the jury could find that as a matter of law she could not have consented" (emphasis in original).

We agree with the defendant that the evidence did not warrant the judge's instruction that there could be no consent if the victim's ability to exercise her free will was restrained due to alcohol. While there was evidence that the victim had consumed two or three beers and two shots of alcohol during the evening in question, there was no evidence that her ability to exercise her will was to any extent affected. To the contrary, as we have previously noted, the victim testified that she was not affected by her alcohol consumption, and other witnesses observing the victim on the night in question confirmed that she did not appear to be intoxicated. In light of this evidence, the judge's reference to possible restraint from exercising her will due to alcohol consumption was unwarranted. Contrast *Commonwealth v. Ascolillo*, 405 Mass. 456, 463-464 (1989) (instruction on relationship between intoxication and consent was warranted where defendant's own testimony indicated that victim had been drinking alcohol and snorting cocaine prior to sexual act and had apparently suffered a seizure from a cocaine overdose); *Commonwealth v. Black*, 50 Mass. App. Ct. 477, 479 (2000) (similar instruction was warranted where there was evidence that the victim, who was eighteen years old and weighed ninety-five pounds, had consumed two large glasses of orange juice and vodka, had been smoking marijuana, and felt drunk and high at time of sexual act).

We also agree that, to the extent the instruction was given at all, it should have included the "wholly insensible" language appearing in *Commonwealth v. Burke*, 105 Mass. 376, 380-381

(1870). More specifically, the judge should have told the jury that "where a man has sexual intercourse with a woman while she is, as he knows, wholly insensible so as to be unable [to] consent[] and with such force as is necessary to accomplish the purpose, [that] is rape, so in this case on the issue of consent, you may consider what state of intoxication, if any, [the victim] was in at the time of the incident alleged in this case." *Commonwealth* v. *Ascolillo, supra* at 463. See *Commonwealth* v. *Simcock,* 31 Mass. App. Ct. 184, 194-195 (1991).

Having reviewed the record, however, we conclude that the instruction, although unwarranted and incomplete, could not have given rise to a substantial risk of a miscarriage of justice in the circumstances of this case. "An error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence' the guilty verdict." *Commonwealth* v. *Alphas,* 430 Mass. 8, 13 (1999), quoting from *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). "In making that determination, we consider the strength of the Commonwealth's case against the defendant (without consideration of any evidence erroneously admitted), the nature of the error, whether the error is 'sufficiently significant in the context of the trial to make plausible an inference that the [jury's] result might have been otherwise but for the error,' . . . and whether it can be inferred 'from the record that counsel's failure to object was not simply a reasonable tactical decision.' " *Commonwealth* v. *Alphas, supra* at 13 (footnote omitted), quoting from *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. 10, 21 (1986).

Here the case against the defendant, particularly his use of force and the victim's affirmative resistance, was strong. Thus, as summarized above, in addition to the victim's own testimony, her roommate, Andrews, and also Officers Lacey and Aspell, each testified that the victim did not appear to be intoxicated after the incident in question, but was upset and was shaking and sobbing. Officer Aspell and Detective Marchese further testified that, when the victim was brought to view the defendant in his apartment shortly after the incident occurred, she backed against a wall, became extremely nervous, and shook. There was also evidence that the victim had a red mark on her neck, scratch marks on her hands, and "bruising and marks continu-

ously on her legs and arms as well as her neck." Finally, there was evidence that, when the police first confronted the defendant in his apartment and informed him of the reason for their presence, the defendant insisted that they must be mistaken because he had stayed inside his apartment all evening and had "witnesses" to that effect. This statement, which the defendant repeated when he was again interviewed by the police following his arrest, was contradicted not only by the victim's testimony, but also by the business card that the defendant had given the victim at the outset of the incident. It therefore constituted strong evidence that the defendant had a consciousness of guilt with respect to the incident. See, e.g., *Commonwealth* v. *Bradford*, 52 Mass. App. Ct. 220, 224 (2001) (discredited alibi constituted "strong evidence of consciousness of guilt").

In view of this evidence, the challenged instruction could not have materially influenced the jury's deliberations. In the first place, we note that the challenged instruction consisted of only a single sentence in a charge occupying thirty-three pages of transcript, and the judge referred to alcohol only once within the sentence. The judge's statement that there can be no consent if a victim's ability to exercise her will is restrained due to fear, to alcohol, or to some other factor was not a central theme of the judge's charge. Compare *Gibson* v. *Commonwealth*, 377 Mass. 539, 543 (1979) (finding harmless single defective sentence in instruction occupying fifty-seven pages of transcript). Rather, the central thrust of the judge's charge was that the Commonwealth was required to prove beyond a reasonable doubt that the sexual intercourse was accomplished "by force or by threat of bodily injury and against the victim's will."

More important, the instruction did not, as the defendant contends, invite the jury to convict the defendant if they found that the victim had consumed any alcohol at all. Rather, viewed in context, the instruction allowed the jury, if they found that the victim had failed to resist the defendant's attack, to convict the defendant only if they also found that the victim had consumed so much alcohol that, at the time of the attack, her ability to exercise her free will was restrained. The word "restrained" means deprived of freedom or liberty. American

Heritage Dictionary of the English Language 1538 (3d ed. 1992).

· Here, as the defendant himself has recognized, no one claimed that the victim was so intoxicated on the evening in question that her ability to exercise her freedom of action was restrained to any extent whatever. Rather, the defendant argued that the victim had actively solicited or participated in any incident that occurred, and the Commonwealth argued that she had affirmatively resisted the defendant's attack. In these circumstances, the judge's instruction regarding possible restraint of a victim's ability to exercise her will due to fear, to alcohol, or to some other cause was mere "surplusage" that could not realistically have affected the jury's deliberations. Compare *Commonwealth* v. *Massey*, 402 Mass. 453, 456 (1988); *Commonwealth* v. *Hyatt*, 31 Mass. App. Ct. 488, 493 (1991). There was no reason for the jury to reach any such issue and little likelihood that they might have done so from the evidence presented to them. Contrast *Commonwealth* v. *Azar*, 435 Mass. 675, 687-688 (2002) (erroneous instruction on third prong malice created substantial risk of miscarriage of justice where jury could have found murder on "mere proof of a plain and strong likelihood of grievous bodily harm"); *Commonwealth* v. *Cowans*, 52 Mass. App. Ct. 811, 820-821 (2001) (erroneous instruction on intent element of armed home invasion created substantial risk of miscarriage of justice where jury could have concluded from evidence presented that defendant had not intended to place occupants of home in fear).

We therefore conclude that the instruction at issue in this case, even if unwarranted by the evidence, did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5-6 (1986); *Commonwealth* v. *Medina*, 43 Mass. App. Ct. 534, 536 (1997). In reaching this conclusion, we are mindful that, where there has been no objection to an alleged error at trial, "[a] new trial will be ordered only in the *extraordinary* situation where . . . we are left with uncertainty that the defendant's guilt has been fairly adjudicated." *Commonwealth* v. *Chase*, 433 Mass. 293, 299 (2001) (emphasis supplied). We have no such uncertainty in this case.

2. *Improper closing argument.* The defendant asserts that the prosecutor made several statements during her closing argument that were improper and warrant reversal. Since there was no objection to any of these statements, we review them only to determine whether there was error creating a substantial risk of a miscarriage of justice. *Commonwealth* v. *Lyons,* 426 Mass. 466, 471 (1998). We note that, while not dispositive, the lack of an objection is "some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." *Commonwealth* v. *Mello,* 420 Mass. 375, 380 (1995), quoting from *Commonwealth* v. *Sanchez,* 405 Mass. 369, 375 (1989). Furthermore, "[r]emarks made during closing argument are viewed in the context of the entire argument, and in light of the judge's instruction to the jury and the evidence at trial." *Commonwealth* v. *Zavala,* 52 Mass. App. Ct. 770, 776 (2001).

The defendant first contends that the prosecutor "insinuated" to the jury that the defendant should not have exercised his right to vigorously cross-examine the victim. Specifically, the defendant claims that the prosecutor should not have stated:

> "Remember when [the victim] was on cross-examination when she was being berated for her good humanitarian deeds for the evening, and that it was so incredible and so disbelieveable that someone would be willing to go and look down [*sic*] on someone that would be willing to talk to someone about their sick mother. Maybe this isn't what you or I or anybody else would do, but it was what [the victim] thought was appropriate. It's what she does for a living."

During his cross-examination of the victim, however, defense counsel referred to her derisively as a "good Samaritan." Thereafter, during his closing argument, defense counsel repeatedly stated that the victim's testimony was "totally unbelievable" and "not the truth." The prosecutor could properly comment on these tactics and arguments of defense counsel. See *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 271-272 (1982).

The defendant further claims that the prosecutor improperly appealed to the jury's "sense of duty" by stating, both at the beginning and the end of her closing, that the defendant "must

be held accountable" for his actions. It is not improper, however, for a prosecutor to argue that a defendant should be held accountable for his actions. See *Commonwealth* v. *Freeman*, 430 Mass. 111, 120 (1999). Even if the statements could be viewed as suggesting that the jury had a duty to convict the defendant, they could not by themselves have created a substantial risk of a miscarriage of justice in the circumstances of this case. See *Commonwealth* v. *Cobb*, 26 Mass. App. Ct. 283, 286-288 (1988).

Finally, the defendant claims that, throughout her closing, the prosecutor improperly vouched for the credibility of the Commonwealth's witnesses. In fact, in each instance cited by the defendant, the prosecutor used the words "I would suggest" or "I suggest" to avoid expressing her personal belief about the witness's truthfulness. The prosecutor could properly argue the credibility of witnesses in the foregoing manner. See *Commonwealth* v. *Raymond*, 424 Mass. 382, 391 (1997).

Moreover, both at the beginning and the end of the trial, the judge clearly instructed the jury that the arguments of counsel were not evidence. The trial judge also instructed the jury to base their decision upon the evidence presented at trial and not upon any sympathy or prejudice. These instructions were adequate to cure any improper vouching by the prosecutor. See *Commonwealth* v. *Pontes*, 402 Mass. 311, 315 (1988).

In summary, having reviewed the entire record in this case, we do not believe that, even if any of the prosecutor's statements about which the defendant complains were improper, they possibly affected the jury's conclusions. See *Commonwealth* v. *Kater*, 432 Mass. 404, 422-423 (2000).

3. *Fresh complaint testimony.* During his testimony, Detective Marchese was permitted to testify as follows with respect to his interview of the victim shortly after the incident had occurred:

Q: "Did she tell you something happened when she was grabbed and thrown onto the bed?"

A: "Yeah, she said he had taken off her sneakers and undid her jeans, pulled down her jeans, and digitally raped her."

Q: "And when he digitally raped her, what did she tell you he did?"

A: "Stuck his fingers inside me."

Q: "Did she tell you that she was touched anywhere else?"

A: "She said she was touched in her breast area also."

The defendant claims that the judge erred in admitting this testimony as evidence of the victim's fresh complaint regarding the incident because it went beyond the victim's trial testimony and constituted a "de facto pronouncement of guilt." The defendant complains particularly that Detective Marchese's reference to "digital rape" constituted a legal conclusion, rather than a mere repetition of what the victim had told him. In fact, however, Detective Marchese was merely summarizing in his own words what the victim had told him. He did not add any details not already mentioned by the victim, nor did he fill any gaps in her testimony. See *Commonwealth* v. *Scanlon*, 412 Mass. 664, 670-671 (1992); *Commonwealth* v. *Juzba*, 46 Mass. App. Ct. 319, 324 (1999). His testimony, therefore, was permissible fresh complaint testimony. See *Commonwealth* v. *Kirkpatrick*, 423 Mass. 436, 444-445, cert. denied, 419 U.S. 1015 (1996).

Moreover, during trial and in her closing charge, the judge forcefully instructed the jury that fresh complaint testimony was to be used for corroborative purposes only and that it was not to be considered substantive evidence of the crimes charged. It is presumed that the jury both understood and followed the judge's admonitions. *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990). The testimony, therefore, even if improper, did not create a substantial risk of a miscarriage of justice requiring reversal of the defendant's convictions.

*Judgments affirmed.*

GREENBERG, J. (dissenting, with whom Doerfer, J., joins). The jury instruction at issue in the case (which was not objected to) posed a substantial risk of a miscarriage of justice. Neither party requested the instruction and, for some inexplicable

reason, the judge chose to include it in her charge. The instruction may have reflected the judge's desire to eliminate any uncertainty in the jurors' minds whether the complainant's sexual encounter with the defendant was, under the general language used by the judge that was drawn from G. L. c. 265, § 22(*b*), "by force and against her will." Although it is true that the defendant's primary defense at trial was that he was not the rapist, cross-examination of the complainant opened up the alternative defense that she consented to having intercourse with him. That being the case, the defendant is entitled to proper instructions on that particular theory. *Commonwealth* v. *Skinner*, 408 Mass. 88, 97-98 (1990). That did not occur here.

The flawed instruction failed to explain adequately the potential effects of alcohol on the complainant's ability to consent and left the jury with the mistaken impression that, if the complainant had anything to drink on the occasion, she was incapable of consenting. That is not the teaching of either *Commonwealth* v. *Ascolillo*, 405 Mass. 456 (1989), or *Commonwealth* v. *Simcock*, 31 Mass. App. Ct. 184 (1991). Instructing the jury in such absolute terms, without a proper evidentiary context, on its face poses a substantial risk of miscarriage of justice.

The broad language of *Commonwealth* v. *Ascolillo, supra* at 463, that the judge used to instruct the jury here, was never confined by specific instruction that a finding of inability to consent would be warranted only if the jurors were convinced beyond a reasonable doubt that the complainant was stupefied, unconscious, or helpless. *Id.* at 464. A juror who took the cynical, but not totally unreasonable, view of the evidence could have abandoned thoughts of reasonable doubt and concluded that, even if the complainant appeared to consent to the sexual encounter, she was unable to give such consent where her will was constrained by alcohol.

On this record that contains ambiguity about how much force was involved, it is impossible to discern whether the jurors convicted the defendant because they found that he forced the complainant to have intercourse or whether they rejected her testimony with respect to force and found the defendant guilty because they believed the complainant incapable of consent

merely because of her ingestion of some alcohol during the course of the evening. Contrast *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 485 (1985), cert. denied sub nom. *Pirrotta* v. *Massachusetts*, 479 U.S. 838 (1986). There is a substantive danger that the erroneous impression created by the judge's instructions to the jury materially influenced the verdict. *Commonwealth* v. *Marcotte*, 18 Mass. App. Ct. 391, 395 (1984). Therefore, I would have reversed the judgments and afforded the defendant a new trial.