## COMMONWEALTH vs. DERRICK FULLER.

No. 04-P-1145.

Plymouth. September 8, 2005. - April 13, 2006.

Present: PERRETTA, SMITH, & BERRY, JJ.

*Rape. Consent. Mental Impairment. Evidence,* Fresh complaint. *Rape-Shield Statute. Practice, Criminal,* Instructions to jury.

At the trial of an indictment charging the defendant with rape by natural intercourse, the testimony of a witness concerning the victim's mental retardation, which was relevant to the issue of consent, was based on the witness's personal observations rather than an opinion based on any particular expertise, and was therefore admissible [89-92]; further, testimony regarding the victim's demeanor when she described the assault to the witness, although inadmissible on fresh complaint grounds, was admissible to show the victim's state of mind and did not exceed permissible limits [92].

At the trial of an indictment charging the defendant with rape by natural intercourse, the judge did not abuse his discretion in precluding the defendant from cross-examining the victim on the issue of her ability to function as a parent to her three children in order to refute the Commonwealth's evidence showing her to have limited mental capabilities. [92-93]

The evidence at the trial of an indictment charging the defendant with rape by natural intercourse warranted the judge's instruction to the jury on mental retardation, but even if the judge's limited reference to mental retardation were error, such error was not prejudicial to the defendant. [93-96]

INDICTMENT found and returned in the Superior Court Department on May 10, 2002.

The case was tried before *Mitchell J. Sikora,* J.

*Robert F. Shaw, Jr.,* for the defendant.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On appeal from his conviction on an indictment charging him with rape by natural intercourse, the defendant argues that the trial judge erred in his various rulings and jury

instructions concerning the victim's mental retardation. We conclude that the evidence concerning the victim's retardation was based on the witness's personal observations rather than an opinion based on any particular expertise, that fresh complaint testimony did not exceed permissible limits, that the judge did not abuse his discretion in precluding the defendant from cross-examining the victim on the issue of her ability to function as a parent to her three children, and that the judge's instructions to the jury on mental retardation do not require reversal of the conviction. Accordingly, we affirm the judgment.[1]

1. *The evidence.* Lena Oliveira of the Department of Mental Retardation (DMR) gave the jury background information about the victim, whom we shall call Linda, as well as fresh complaint testimony. At the time of the acts charged in the indictments, September 30, 2001, Linda was thirty-three years of age. She has always lived with her mother and sister in a multi-family house in which her brother also resides in an apartment separate from them. As put by Linda during her testimony, "they make sure I do the right thing."

Linda dropped out of school at the age of sixteen and has never worked nor driven a car. Since at least 1994, she has been receiving services from the DMR, including the assistance of Oliveira. DMR also gives Linda a weekly spending allowance of forty dollars from her Social Security benefits which are paid directly to the DMR.

Based on her review of Linda's history, as well as her personal observations of Linda made during the eight and one-half years of working with her, Oliveira described Linda as slow to learn. Oliveira related that Linda attended a day program, worked with coaches, and, despite job training for about six to seven years, was still not ready for employment within the community. Oliveira explained that it was her responsibility to provide Linda with needed assistance, includ-

---

[1]At the close of all the evidence, the judge allowed the defendant's motion for a required finding of not guilty on an indictment charging him with an indecent assault and battery on a mentally retarded person. He did so on the stated basis that the conduct comprehended by that indictment was not sufficiently distinct from that which formed the basis of the indictment charging rape by unnatural intercourse. The jury returned not guilty verdicts on indictments charging the defendant with rape by unnatural intercourse and sodomy.

ing reminders concerning her personal hygiene and medicines, the scheduling of and transportation to medical, psychiatric and counseling appointments, and social activities. According to Oliveira, Linda was not capable of being on her own in society. She was assigned a support person to take her on various activities, such as shopping, to the movies, or to the park. Linda had no friends with whom she spent time alone.

Oliveira testified that Linda has difficulty communicating and expressing her thoughts and feelings. As described by Oliveira, speaking with Linda is like speaking with a much younger person; that is, Linda does not make eye contact during conversation and takes much time to register what is being said to her and to formulate a response. According to Oliveira, Linda's condition has been her normal condition throughout her entire life and not the result of any brain injury. While working with Linda over the years, it was Oliveira's responsibility to speak with and listen to Linda about her problems. Based on the history of her relationship with Linda, Oliveira testified that Linda's intellectual abilities were the same at the time of trial as on May 10, 2002. However, Linda's physical appearance had changed. While she was slim and attractive at the time of the events in issue, she had gained weight prior to trial.

We turn to the acts charged in the indictments. Linda testified that sometime in early September, 2001, she went to a lounge in Fall River called Jake's. She was accompanied by her brother's girlfriend and two other women. While at Jake's she met a man named Alexander Durden, the defendant's roommate. They conversed, consumed alcohol, and danced for about two hours. During that time, Durden gave her a piece of paper with his telephone number on it and told Linda to call him. Linda did not give Durden her telephone number.

Between the time that they met and September 29, 2001, Linda called Durden and spoke with him several times. They made plans for Durden to meet her near her house on September 29, 2001. Linda left her home that night while everyone was asleep and met Durden, who was accompanied by the defendant. Durden told Linda that they were going to go to his house in Brockton, and Linda told the men that she planned to return home that night. Along the way from Fall River to Brockton, Durden stopped at a liquor store.

Once at the men's apartment in Brockton, the men and Linda sat down to watch television. The defendant gave Linda alcoholic beverages without her having requested them. When Durden and the defendant told Linda to dance, she did so, albeit alone. When she became sleepy from the drinks, Linda lay down on the sofa until Durden twice told her to go into the bedroom.

Without understanding why Durden was accompanying her, Linda went into the bedroom. Once in the bedroom, Linda stood silent and still while Durden closed the door and undressed himself as well as her. He told her that she had a nice body, pushed her onto the bed, ignored her demands that he stop, and engaged in vaginal intercourse with her. When finished, Durden left the room. Because of her alcoholic stupor, Linda could not get up from the bed and, instead, covered herself.

Next, the defendant came into the room, disrobed, and informed Linda that he was going to "fuck her in the ass," and that she would enjoy it. According to Linda, the defendant made numerous attempts to insert his penis into her anus while ignoring her insistence that he stop and telling her that she would enjoy the experience. Throughout this time, Linda told the defendant to stop, attempted to get out of the bedroom, and felt as if she could not breathe. As further related by Linda, the defendant was eventually able to accomplish his stated intention of having anal intercourse with her, as well as having vaginal intercourse with her. Having satisfied himself, the defendant left the bedroom and went into the main room where the television set was located. After a time, Linda also went into that room and sat in a chair until it became light outside. When Durden and the defendant assured Linda that she was a nice girl, she responded, "yeah, I know," and "[e]verybody says that." The two men brought her home that morning.

Linda did not tell her family about the rapes. It was not until the end of October, 2001, that she told Oliveira what had happened. Linda complained about pain in her stomach, rectum, and vagina, and a bladder problem. In the meantime, Oliveira noticed that Linda was talking very little and crying a lot of the time. She smelled bad, acted nervous, and did not want to go

anywhere with anyone. When Linda, in tears, finally related to Oliveira the details of what had happened to her, Oliveira brought her to a mental health center and then to a hospital. Oliveira told the jury what Linda had told her about the events in issue.

Testifying on his own behalf, the defendant's version of the events was in stark contradiction of that given by Linda. The defendant stated that he had consensual vaginal intercourse with Linda, the aggressor in their sexual encounter. He described Linda as a nice person who seemed to be intelligent. When he asked her about "the way she talked," he said that she replied, "Well, I'm Portuguese." Although he claimed that Linda had telephoned Durden at least ten times, he ultimately agreed, when confronted with telephone records, that she had made only three short (about a minute) telephone calls to Durden. He insisted that the discussions during these three calls concerned directions to her home and whether her sister would accompany her as a "friend." As related by the defendant, it was made clear to Linda during these telephone conversations that the defendant was not looking to be "hooked up" with someone, that he only wanted someone else along so that they all could be "basic friends."

According to the defendant, he and Durden were at work on the night in issue when Linda, at about 8:00 P.M., called them. During this conversation, they made plans to meet after he and Durden finished work at 11:00 P.M. After work, the two men returned to their apartment and then proceeded to Fall River. During the drive, in which the men became lost for about twenty minutes, they received a telephone call from Linda who directed them to a location across the street from her home. He stated that she knew from the beginning that he would be with Durden and that they would be returning to their apartment in Brockton.

As described by the defendant, Linda was wearing tight pants and a tight blouse. During the drive, Linda told the defendant that she thought his head was sexy and asked if she could rub it. The topic of sex was brought up by Linda when she suggested a "menage a trois." Because it was something Linda wanted to do, he and Durden thought her idea was "cool." However, and as the defendant explained to the jury, he really

only wanted to "hang out," that the idea of a "menage a trois" did not excite him, that he is "not a person to get aroused over sex," and that he did not even become excited when Linda, at the apartment, danced slowly and grabbed his crotch. The defendant also testified that the alcoholic beverages consumed by him and Linda had no effect on either of them.

The defendant related that once he, Durden, and Linda arrived at the apartment, they sat in the living room watching television. After a short time, Linda began to sing, dance, and grab Durden and him between their legs. Next, Linda and Durden went to the bedroom. Although Linda invited him to join them, the defendant declined. Consequently, he remained in the living room. About forty-five minutes later, Durden returned to the living room, and Linda signaled the defendant to join her in the bedroom, which he did. He stated that inside the bedroom, Linda kissed him, told him that he was a "big boy,"[2] undressed, masturbated, and engaged in consensual vaginal intercourse with him.

After engaging in what he insisted were consensual sexual activities with Linda, he and she returned to the living room where she had another alcoholic beverage and complained about her family. That morning, he and Durden drove Linda to her home in Fall River and resisted her insistence that they meet again that evening on the basis that they had to work.

The defendant also admitted to the jury that he never revealed his true name to Linda. He also told the jury that he and Durden agreed not to see Linda again because she was a "slut."

2. *Discussion.* We consider the defendant's claims on appeal against the backdrop of the evidence presented. While Linda testified that the intercourse was by force and without her consent, the defendant claimed it was consensual. To meet its burden of proving lack of consent, the Commonwealth presented Oliveira's testimony to show that Linda had limited mental abilities which were relevant to whether she had consented to the defendant's acts.

On appeal, the defendant argues that mental retardation is a complicated medical subject entailing specific methods of

---

[2]Linda and the defendant weighed, respectively, about 130 and 300 pounds.

diagnosis and measurement that require expertise, and that the judge erred in allowing Oliveira to testify about Linda's retardation without first ascertaining that her opinion "ha[d] a reliable basis in the knowledge and experience of [her] discipline." *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25 (1994), quoting from *Daubert* v. *Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993).[3] His arguments fail for the following reasons.

The defendant does not take into account the fact that Oliveira did not give any expert opinion that Linda's mental retardation precluded her from consenting to sexual intercourse. In *Commonwealth* v. *Aitahmedlamara*, 63 Mass. App. Ct. 76, 77-78 (2005), we considered the quantum of proof necessary to show that a victim of a sexual assault was mentally retarded in order to support an indictment charging an indecent assault and battery on a mentally retarded person. There, a DMR service coordinator testified that the victim was eligible to receive services from DMR, that only persons with an intelligence quotient (IQ) level of 76 were eligible to receive such services, and that the victim's IQ had tested at 33. We held that given the evidence of the victim's severe mental impairment, expert testimony was not required. In reaching this conclusion, we also considered the fact that because the victim gave extensive testimony at trial, the jury "were able from their own observations of her to assess . . . the question of her mental retardation." *Id.* at 78. See *Commonwealth* v. *Bonds*, 445 Mass. 821, 829-833 (2006).

We see no meaningful difference between the testimony given by the DMR worker in *Aitahmedlamara* and Oliveira. Oliveira had worked with Linda for over eight and one-half years and was competent to testify about the daily caretaking services that she provided Linda during the course of those years as well as

[3]Before Oliveira took the witness stand, trial counsel for the defendant made a clear objection to any testimony by her that Linda was mentally retarded or to any specific test results. On the one occasion that Oliveira's testimony could be viewed as based on some expertise, she testified that Linda had the mental capacity of a nine year old child, the judge ordered that her statement be struck from the record. Also, although appellate counsel for the defendant argues in his brief that the judge failed to adhere to the gate-keeping standards set out in *Commonwealth* v. *Lanigan*, 419 Mass. at 26, he acknowledged during oral argument before us that Oliveira's testimony did not touch upon new or novel scientific evidence.

her observations concerning Linda's limitations in caring for herself. See *Commonwealth* v. *Sturtivant,* 117 Mass. 122, 133 (1875); *Commonwealth* v. *Austin,* 421 Mass. 357, 366 (1995); *Commonwealth* v. *Pleas,* 49 Mass. App. Ct. 321, 324 (2000); *Commonwealth* v. *Orben,* 53 Mass. App. Ct. 700, 704 (2002). See also Liacos, Brodin, & Avery, Massachusetts Evidence § 75, at 382 (7th ed. 1999) (lay witness may testify about "emotional, mental or physical condition of another in terms of summary description"). Also, like the victim in *Aitahmedlamara,* Linda testified extensively at trial. Her testimony shows that she was unable to comprehend complex words and questions and to maintain focus. See *Commonwealth* v. *Roderick,* 411 Mass. 817, 819 (1992) ("The victim's presence and conduct in the courtroom were relevant to the issue whether the defendant would have known that the victim was mentally retarded").

Even were we to read *Aitahmedlamara* in the manner suggested by the defendant, that is, as requiring the opinion of an expert witness on the question of Linda's mental retardation, such evidence was not required on the indictments put before the jury. The judge having allowed the defendant's motion for a required finding of not guilty on the indictment charging him with an indecent assault and battery on a mentally retarded person, see note 1, *supra,* the issue before the jury on the indictments before them was far broader than whether Linda was mentally retarded. The issue before the jury was whether Linda lacked the ability to consent to the acts the defendant admittedly committed. Resolution of that question did not require expert testimony concerning the specific etiology of any limitations relevant to her consent. See, e.g., *Commonwealth* v. *Curtiss,* 424 Mass. 78, 83 (1997) (prosecutor's argument that victim had limited mental capacity relevant to the issue of consent was properly based on victim's testimony); *Commonwealth* v. *Bonds,* 445 Mass. at 829-833 (evidence that victim's mental disorder caused her to be overly trusting relevant on issue of consent); *Commonwealth* v. *Eldridge,* 28 Mass. App. Ct. 936, 937 (1990) (rational trier of fact could reasonably infer from testimony of twenty-two year old brain damaged man that he lacked mental ability to consent to the sexual acts involved). Cf. *Commonwealth*

v. *Brennan*, 399 Mass. 358, 364 (1987) (Commonwealth may prove sanity without expert testimony).

Equally unavailing is the defendant's claim that Oliveira's fresh complaint testimony exceeded permissible limits.[4] His contention is based on Oliveira's description of Linda's demeanor when she described the assault to her. Oliveira stated that Linda was "[v]ery nervous, very drained," and that she was "[c]rying most of the time." Although inadmissible on fresh complaint grounds, the testimony was admissible to show Linda's state of mind. See *Commonwealth* v. *Montanez*, 439 Mass. 441, 450 (2003).

We also do not find any force in the defendant's contention that the judge erroneously precluded him from cross-examining Linda about her parenting skills in order to refute the Commonwealth's evidence showing her to have limited mental capabilities. The question of Linda's children was first raised by the Commonwealth's motion in limine brought prior to impanelment of the jury. The Commonwealth asserted in that motion that the fact that Linda had children constituted evidence of prior sexual misconduct on her part and should not be mentioned during trial. At that time, defense counsel represented that he did not intend to bring into issue the fact that Linda had children. During the trial, however, defense counsel filed a motion seeking to cross-examine Linda about the fact that she was a mother and her ability to function as a parent. In support of his request, he informed the judge that he had reports from the Department of Social Services (DSS) that reflected that Linda had children who were in the legal custody of DSS. Defense counsel represented that he wanted to question Linda about her parenting skills to show that she was able to care for her children and thereby rebut the Commonwealth's evidence of her mental limitations.

The judge denied the motion on the basis of his concern that such questions might circumvent the purpose of G. L. c. 233, § 21B, the so-called Rape Shield Statute, by raising a collateral issue that could make Linda appear to have a predisposition for

---

[4]See *Commonwealth* v. *King*, 445 Mass. 217, 237-238 (2005), for considerations applicable to what is now to be referred to as "first complaint testimony."

promiscuity. See *Commonwealth* v. *Houston*, 430 Mass. 616, 621 (2000). The judge's concern was exacerbated by the fact that defense counsel, rather than making some showing at the pretrial hearing on the Commonwealth's motion in limine that he had relevant information showing that any limitation on Linda's mental abilities was not so severe as to interfere with her parenting skills, announced that he had no intention of questioning Linda about her children.

There is nothing in the record before us that remotely supports the defendant's claim that the judge abused his discretion or committed other error of law in precluding him from cross-examining Linda for the purpose of showing that she possessed substantial parenting skills.[5] See generally *Commonwealth* v. *Russo*, 49 Mass. App. Ct. 579, 586 (2000) ("Being entirely speculative, [the defendant's] assertions of prejudice accordingly are not susceptible of resolution in this appeal"). See also *Commonwealth* v. *Farley*, 443 Mass. 740, 748 n.12, cert. denied, 126 S. Ct. 733 (2005), citing *Commonwealth* v. *Miles*, 420 Mass. 67, 71-72 (1995) ("While a criminal defendant is entitled to a reasonable cross-examination of the Commonwealth's witnesses, the scope of the cross-examination rests largely within the discretion of the trial judge, and we will not disturb the judge's ruling unless the defendant demonstrates that [he] was prejudiced by the judge's abuse of discretion").

As his final argument on appeal, the defendant claims error in the judge's final instructions to the jury. The judge informed the jury that one of the elements of rape was that "the accused person must have accomplished the penetration by force and against the will of the complainant" and that they could "examine the total circumstances in order to decide whether the accused person acted with force." In instructing on the issue of constructive force and the complainant's ability to consent, the judge stated:

"[I]f the jury finds that there was constructive or

---

[5]Appellate counsel's claim that at the time of the pre-trial hearing, trial counsel had no idea that Linda would be presented as "naive, sheltered and unable to function," lacks persuasive force in light of the Commonwealth's burden of proof throughout the trial on the indictment charging the defendant with an indecent assault and battery on a mentally retarded person.

circumstantial force by reason of the total circumstances and the attributes of the person involved, including age, size, sophistication, location, and other circumstances, then the jury can find that there was constructive or circumstantial force.

"[O]ne final point that has come up several times during the course of our trial is the circumstance or factor of mental retardation.

"[M]ental retardation is not an element of any of the offenses. . . that I defined for you . . . [and] does not play an integral role in the definitions of those offenses [rape by natural intercourse, rape by unnatural intercourse, and sodomy]. You will notice that mental retardation may be pertinent to your consideration to the issue of consent and it may be pertinent to your consideration of the issue of constructive force.

"So I want to give you the definition in Massachusetts law of mental retardation. Now, there is a very general definition that exists in the statute and within a regulation of the Department of Mental Retardation. Let me give you that definition as it currently stands.

"A mentally retarded person is a person who, as a result of inadequately developed or impaired intelligence, is substantially limited in his or her ability to learn or to adapt to the means necessary to function effectively in the community."

Defense counsel objected to the instruction on mental retardation, but the judge overruled the objection on the basis that it was given "for corroboration, sophistication, mental disability for purposes of [determining] constructive force."

On appeal the defendant argues that the subject of mental retardation should not have been put to the jury. He claims that there was "unqualified and unreliable" testimony concerning the issue as well as insufficient evidence of mental retardation, that "mental retardation" was not an element of any of the crimes set out in the indictments before the jury, and that the instruction was inconsistent with the various definitions established by the American Association of Mental Retardation

(AAMR), the American Psychiatric Association (APA), and the American Bar Association (ABA), which, the defendant claims, have been generally accepted in other jurisdictions.[6] These arguments fail for the following reasons.

Although the judge's allowance of the defendant's motion for a required finding of not guilty on the indictment brought under G. L. c. 265, § 13F, see note 1, *supra,* made it unnecessary for the Commonwealth to prove, and the jury to determine, whether Linda was, in fact, mentally retarded, the question whether she consented to the acts charged remained open on the indictments put to the jury. Cf. *Commonwealth* v. *Ascolillo*, 405 Mass. 456, 463-464 (1989) (instruction on relationship between intoxication and consent was warranted where defendant's own testimony indicated that complainant had been drinking and ingesting cocaine prior to sexual act and apparently had suffered a seizure from cocaine overdose); *Commonwealth* v. *Black*, 50 Mass. App. Ct. 477, 479 (2000) (instruction warranted on relationship between intoxication and consent on evidence that the eighteen year old, ninety-five pound victim "had consumed two large glasses of orange juice and vodka, had been smoking marijuana, and felt drunk and high" at time of sexual act).

Where there is evidence to show that a rape victim was unable to exercise his or her free will due to drugs, alcohol, or other mental impairment, a judge may instruct the jury that they can consider the impairment in assessing whether the victim had consented to the sexual act. In order to warrant such an instruction, there need only be some evidentiary basis to support the suggestion that the victim suffered from some impairment causing a lack of control. See *Commonwealth* v. *Simcock*, 31 Mass. App. Ct. 184, 195 (1991). Contrast *Commonwealth* v. *Molle*, 56 Mass. App. Ct. 621, 626 (2002) (where "there was no evidence that [the victim's] ability to exercise her will was to any extent affected" by alcohol, an instruction to the contrary was unwarranted). We need not again recite Oliveira's testimony. See part one of this opinion, *supra.* It is enough to state that her admissible testimony was more than sufficient to warrant the judge's instruction which he made clear was only

---

[6]We assume without deciding that the defendant's objection to the jury instruction was sufficient to save the various claims he asserts on appeal.

applicable to the question whether Linda had consented to sexual intercourse with the defendant.

Moreover, the judge's instruction on mental retardation was consistent with the usual and accepted understanding of the meaning of the words "mentally retarded" as well as the definition promulgated by the DMR at 115 Code Mass. Regs. § 2.01 (1994). See *Commonwealth* v. *Aitahmedlamara*, 63 Mass. App. Ct. at 76-77.

Even were we to conclude that the evidence did not support the judge's specific reference to "mental retardation," we would conclude that any such error was not prejudicial to the defendant. The judge made clear to the jury that mental retardation "did not play an integral role in the definition [of rape]" and, instead, was simply a factor that could be considered on the question of consent and constructive force. The judge's limited reference to "mental retardation" added nothing to the evidence that was before the jury. Moreover, when the jury, after several hours of deliberation, asked for further instruction on constructive force, the judge repeated the relevant general factors, including the comparative sophistication of the parties, without mention of or reference to mental retardation. See, e.g., *Commonwealth* v. *Wojcik*, 43 Mass. App. Ct. 595, 611 (1997) ("The last words the jury heard were from the correct supplementary instruction"). We can say with assurance that when the admissible evidence is taken in combination with the judge's repeated instructions to the jury, any perceived error in those instructions could have had, at best, a very slight effect on the verdict.

3. *Conclusion.* It follows from what we have said that there is no basis for reversing the defendant's conviction.

*Judgment affirmed.*