COMMONWEALTH *vs.* ANTHONY MORAN.

Norfolk. April 7, 2003. - May 29, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Evidence,* Credibility of witness, Relevancy and materiality, Hospital record. *Practice, Criminal,* Duplicative convictions, Instructions to jury. *Consent. Rape. Indecent Assault and Battery. Intoxication.*

At the trial of indictments charging indecent assault and battery on a person over the age of fourteen years and assault and battery, the judge erred in precluding the defendant from introducing in evidence (in a sanitized form) a hospital record of the complainant that predated the date of the alleged assaults on the complainant to impeach her testimony, where the complainant's credibility was central, and where the record's relevance and probative value far outweighed any potential prejudice to the complaint; further, as credibility was pivotal to the alleged sexual assaults, and because it was clear that the jury did not fully credit the complainant's testimony, the exclusion of the record required a new trial. [486-489]

In a criminal case in which the judge failed to instruct the jury that convictions of both indecent assault and battery and assault and battery had to be predicated on separate acts, it was necessary to set aside the assault and battery conviction as the assault and battery conviction would, in the circumstances here (although not in the ordinary case), have been duplicative of the indecent assault and battery conviction. [489]

At the trial of an indictment charging indecent assault and battery, the judge did not err in refusing to give a mistake of fact instruction as to consent, where there was no entitlement to the instruction requested; further, there was a sufficient evidentiary basis to warrant the judge's instruction on the relationship between intoxication and consent. [489-491]

INDICTMENTS found and returned in the Superior Court Department on December 18, 1996.

The cases were tried before *Thomas E. Connolly,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Michael J. Traft* for the defendant.

*Tracey A. Cusick,* Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court acquitted the

defendant on charges of aggravated rape and rape, and convicted him on charges of indecent assault and battery on a person over the age of fourteen years and assault and battery. The charges stemmed from accusations by the complainant that the defendant, and his friend, Michael O'Connor, had sexually assaulted her. The defendant and O'Connor were tried together, and the jury acquitted O'Connor of all charges, which included charges of aggravated rape, indecent assault and battery, and assault and battery.

Represented by new counsel, the defendant appealed, asserting that the judge erred in precluding him from introducing a hospital record of the complainant that predated the date of the alleged sexual assaults to impeach her testimony and erred in his instructions to the jury on consent and assault and battery. The Appeals Court, in an unpublished memorandum of decision and order entered pursuant to its rule 1:28, vacated the judgment on the indictment charging assault and battery, concluding that it could have been duplicative of the indecent assault and battery conviction, and affirmed the indecent assault and battery conviction. *Commonwealth* v. *Moran*, 55 Mass. App. Ct. 1116 (2002). We granted the defendant's application for further appellate review. We conclude that the assault and battery conviction should be vacated as duplicative, but that a new trial is required on the indecent assault and battery conviction because the judge improperly excluded the hospital record.

The background of the case is as follows. After meeting the defendant at a Boston night club in the early morning of November 10, 1996, the complainant agreed, after the night club closed, to accompany him, his friend, O'Connor, and her friend, whom we shall call Ann, to O'Connor's mother's house in Braintree. At the time, the complainant was twenty-two years of age, and the defendant and O'Connor were in their early twenties. The complainant had known the defendant, her stepfather's cousin, and O'Connor for approximately eight to ten years. Before arriving at the Braintree house, all four individuals had consumed varying amounts of alcohol. Additionally, the complainant had taken one Percocet, pain medication that she testified had been prescribed for her after undergoing a recent laparoscopy to remove a cyst from one of her ovaries.

The complainant's testimony differed significantly from that of the defendant's with respect to what occurred at the Braintree home. According to the complainant, shortly after arriving at the home, Ann went upstairs with O'Connor to his room. The complainant asked for a drink of water, then went to O'Connor's sister's room to sleep. The defendant and O'Connor moved some boxes off of one of the twin beds in that room. The complainant took off her boots then got into the bed under the covers. The defendant and O'Connor left the room.

The complainant later awoke to "pain and pressure" in her vaginal and anal area. She saw the defendant standing next to her and O'Connor at the end of the bed. The complainant had been partially undressed. The defendant and O'Connor had their fingers inside her vagina and anus, and also fondled her breasts. The complainant was scared, pushed their hands away, rolled over and covered herself with the bed covers. The defendant and O'Connor left the room and the complainant fell back to sleep.

The complainant was again awakened to find the defendant on top of her with his penis inside her vagina. She said "no" and tried to push him off. The defendant stated, "What's the matter? Don't you like it?" The defendant got off of the complainant, then tried to put his penis in her mouth. She pushed him away. The defendant then leaned over the complainant and began masturbating, eventually ejaculating on her neck. He then left the room and showered. The complainant dressed and woke up Ann, telling her that she wanted to leave and would take a taxicab. The defendant and O'Connor insisted on driving the complainant home, and drove both women to the complainant's mother's house in Weymouth, arriving at approximately 6 A.M.

Immediately on being dropped off, the complainant told Ann what had happened to her. She also told her mother and sister about the incident. Her mother took her to a nearby hospital, where she was later interviewed by a Braintree police officer. The following day, the complainant was interviewed by a Braintree detective.

The complainant's testimony was supported by the testimony of five fresh complaint witnesses, namely Ann, the complainant's

mother and sister, a nurse from the hospital, and the detective. The nurse testified that her examination of the complainant revealed swelling at the vaginal opening and a bruise on the complainant's thumb and thigh. An employee of Cellmark Diagnostics, a DNA testing laboratory, testified that the defendant could not be excluded as the donor of DNA obtained from sperm fractions found in the complainant's mouth (taken by, and preserved in, an oral swab), and on the complainant's chest area (taken by, and preserved in, a swab). (No seminal fluid or semen had been found on swabs of the complainant's vagina and anus.)

The defendant testified that on the ride to the Braintree house, he and the complainant had kissed. When the group arrived at the house, O'Connor got a beer for each of them. Shortly thereafter, O'Connor and Ann went upstairs, leaving the defendant and the complainant alone in the living room. After some conversation the defendant and the complainant began kissing. The complainant sat on top of the defendant, facing him. They began touching each other; the complainant rubbed the defendant's crotch, and he touched her breasts and rubbed her crotch.

They went upstairs to a bedroom. The defendant moved some boxes off of one of the twin beds, and then they laid down on the bed. After some kissing, the defendant pushed the complainant's dress over her breast area and fondled her breasts while she rubbed his crotch. The complainant unzipped his pants and masturbated him. The defendant ejaculated on her chest. After some conversation, the defendant went downstairs and went to sleep on the couch.

The defendant later awoke to see the complainant putting on her boots. She said she was going to take a taxicab home and the defendant said he would give her a ride. The defendant and the complainant went into O'Connor's bedroom and woke up O'Connor and Ann. The four of them got into O'Connor's vehicle and dropped off the complainant and Ann at the complainant's mother's house. The defendant and O'Connor returned to the Braintree house.

Later that morning the defendant spoke with the complainant's stepfather. The defendant initially told him that nothing had

happened with the complainant. Later that day, after learning from the stepfather that semen had been found on the complainant's chest, the defendant told his version of the incident to the stepfather.

1. The complainant testified that approximately two weeks before the November 10 date of alleged sexual assaults (at the end of October or beginning of November, 1996), she had been hospitalized for four to six days to have a cyst removed from one of her ovaries by means of a laparoscopy. She testified that she was then prescribed Percocet for pain. The complainant also testified that the evening preceding the alleged sexual assaults was the first evening she went out socially following her laparoscopy. She further explained that, when she had awakened to find the defendant on top of her with his penis inside her vagina, she was concerned because she "had stitches in her belly button area," and because, following the laparoscopy, she "wasn't supposed to have intercourse for two weeks." During the cross-examination of the emergency room physician who had seen the complainant at the hospital hours after the alleged sexual assaults, the prosecutor elicited testimony that a laparoscopy could be performed through the belly button.

Now becoming aware for the first time at trial of the complainant's alleged laparoscopy, counsel for O'Connor subpoenaed the hospital's keeper of records to obtain "all medical records" of the complainant. O'Connor's counsel learned from an examination of the records, and in particular, the operative report, that, during the relevant time period (namely on October 29, 1996), the complainant did not have a laparoscopy, but had "an entirely different procedure" called a sigmoidoscopy. O'Connor's counsel, joined by the defendant's trial counsel (who had not examined the records, but relied on the representations of O'Connor's counsel), sought to introduce the record, subject to sanitization so that only the fact of the sigmoidoscopy would be placed before the jury and then only for credibility purposes. The prosecutor objected, arguing that O'Connor's counsel had failed to follow the protocol provided for by *Commonwealth* v. *Bishop*, 416 Mass. 169, 179-183 (1993), as modified by *Commonwealth* v. *Fuller*, 423 Mass. 216, 226 (1996) (*Bishop-Fuller* protocol), and that she had

previously sent to O'Connor's predecessor trial counsel and to the defendant's trial counsel, the complainant's "OB/GYN records from [another local medical facility]" that incorporated "this laparoscopy . . . and all that."[1] O'Connor's counsel argued that the *Bishop-Fuller* protocol applies only to privileged records. The judge, however, expressed concern about "the way [the] record was obtained" (apparently referring to disregard of the protocol), and further noted the lack of expert testimony to explain the differences between a laparoscopy and a sigmoidoscopy. After reviewing the relevant records in camera, the judge said he would consider admitting the record of the sigmoidoscopy only if the defendants offered an accompanying medical expert, which neither defendant did.

In the circumstances of this case, which involved surgical or medical procedures to which no claimed privileges apply, statutory or otherwise, there is no basis to invoke the *Bishop-Fuller* protocol, and we reject the Commonwealth's argument to the contrary.[2] We conclude that the judge should have permitted defense counsel to introduce the record (in a sanitized form) because credibility was central, and the record's relevance and probative value far outweighed any potential prejudice to the complainant. In light of the limited purpose for which the record was being offered, and the language and contents of the record, explanation by a medical expert of the diagnostic terms

---

[1]Examination of the records that the prosecutor furnished defense counsel before trial does not include any record that references the October, 1996, sigmoidoscopy, or any record that contains information that the complainant underwent a laparoscopy in the weeks immediately preceding the alleged assaults. Prior to trial, counsel for O'Connor had filed a motion, which was denied by a judge who was not the trial judge, seeking "an opportunity to question the complainant regarding . . . [t]he dates, locations, and names of physicians, psychologists, rape counselors, or other care givers of any sources medical or psychological who provided a diagnosis, treatment, care or counseling of the complainant" because the Commonwealth "refused to disclose such information even though it is non-privileged."

[2]The defendant concedes, as he must, that the subpoena for the complainant's hospital records was "overbroad because it potentially encompassed records that may [have been] protected by . . . privileges." Although no fault can be attributed to the defendant's trial counsel (O'Connor's trial counsel served the subpoena), we point out that defense counsel should have raised the issue concerning the unknown laparoscopy with the judge when its apparent relevance first arose so that the matter could have been more expeditiously addressed.

was not necessary. The testimony of the complainant and the emergency room physician would have allowed the jury to understand that a laparoscopy was a medical procedure that involved, in the complainant's case, an incision to the belly button area. In contrast, the October 29, 1996, operative report made clear that the procedure performed on the complainant that day was a sigmoidoscopy, in which "an Olympus flexible sigmoidoscope was passed into the rectum" to observe her "[r]ectum, sigmoid, [and] descending colon."[3] These were two distinct procedures involving different bodily entry points. The fact that only the former procedure, the laparoscopy, required the creation of an opening by way of a surgical incision, would be readily understandable to lay jurors from the trial testimony and the text of the operative report. While further information from a medical expert concerning the differences between these procedures may have aided the defense, such testimony was not required to impeach the complainant's testimony that, in late October, 1996, or early November, 1996, she underwent a laparoscopy that involved stitches and received medical advice to refrain from sexual intercourse. A lay person could also discern from the hospital report that a sigmoidoscopy, not a laparoscopy, was performed at the pertinent time, and that no stitches to the belly button were involved.

The judge's erroneous exclusion of the record created a substantial risk of a miscarriage of justice. See *Commonwealth v. Alphas*, 430 Mass. 8, 13 (1999). It was the complainant who first mentioned the subject matter of the laparoscopy. Her testimony not only provided an explanation for why she had taken Percocet before the alleged sexual assaults (which was likely to come out because of the toxicology screening done at the hospital on the morning of the alleged sexual assaults). It also substantially bolstered her claim that she had not consented to the sexual activity that had allegedly occurred because sexual

---

[3]While the operative report notes that the complainant "may need a laparoscopy," the remaining records from the complainant's October, 1996, admission, including a discharge summary, state that a laparoscopy should only be done if the complainant's pain persisted. The hospital records contain an entry under past medical history that states that the complainant "had a laparoscopy in March 1996 showing mild endometriosis . . . [and] a laparoscopy in January 1996 to rule out ectopic pregnancy."

activity was medically precluded by the laparoscopy, and personally by reason of her stitches. From the medical records, however, there is nothing to suggest that the sigmoidoscopy procedure resulted in any prescription for Percocet, any prohibition against sexual intercourse, or any stitches. While the Commonwealth suggests that the complainant was merely confusing the dates of the various medical procedures she had undergone (which did include two earlier laparoscopies), such that her mistake was innocuous and unlikely to affect credibility, the fact remains that her claimed recent laparoscopy provided her with ostensible reasons for rejecting any sexual advances on the night in question. The medical records would have enabled the defendant to demonstrate that no such reasons existed on that date. Increasing the risk of a miscarriage of justice is the fact that the prosecutor, in both her opening and closing statements to the jury, mentioned that, prior to the alleged sexual assaults, the complainant had recently undergone a laparoscopy. Because credibility was pivotal to the case, and because it can be inferred from the jury's acquittal of the defendant on the aggravated rape and rape charges, and their acquittal of the codefendant on all charges, that the jury did not fully credit the complainant's testimony, we conclude that the erroneous exclusion of the record requires a new trial.

2. We agree with the Appeals Court that, because the judge did not instruct the jury that convictions of both indecent assault and battery and assault and battery had to be predicated on separate acts, the assault and battery conviction would, in the circumstances here (although not in the ordinary case), be duplicative of the indecent assault and battery conviction. See *Commonwealth* v. *Thomas*, 400 Mass. 676, 681-682 (1987); *Commonwealth* v. *Juzba*, 46 Mass. App. Ct. 319, 325 (1999). Consequently, the assault and battery conviction must be set aside.

3. Because the issues concerning the propriety of the jury instructions on consent may arise at any retrial, we address those issues.

(a) At trial, the defendant denied putting his fingers in the complainant's vagina or anus, and denied inserting his penis into the complainant's vagina. He testified that he had kissed

the complainant, rubbed her crotch, touched her breasts, and that she had masturbated him, all of which took place with her actual consent. This testimony varied significantly from the complainant's, who testified that the defendant had inserted his fingers or other hard object into her vagina and anus, had touched her breasts, and had inserted his penis into her vagina. In addition, as to the first two categories of sexual touching, the complainant testified that she had pushed the defendant's hands away from her, and then rolled over, covering herself. As to the alleged rape, the complainant testified that she told the defendant, "no," and that she tried to push him off of her. Considering this evidence and the defendant's theory at trial that the complainant had actually consented to sexual activity other than that described by her, we conclude that the judge did not err in refusing to give a mistake of fact instruction as to consent. Cf. *Commonwealth* v. *Lopez*, 433 Mass. 722, 732 (2001) (where defendant's theory at trial was that victim actually consented to rape and where evidence did not support mistake of fact as to consent instruction, no error in judge's refusal to so instruct jury). As in rape cases, the elements necessary for proving indecent assault and battery on a person over the age of fourteen years do not require that the defendant intend that the touching contemplated be without consent. Cf. *id.* at 727. But see *Commonwealth* v. *Simcock*, 31 Mass. App. Ct. 184, 188 (1991) (in prosecuting indecent assault and battery, Commonwealth must prove lack of consent as in rape case). We have repeatedly stated that there is no entitlement to the instruction requested. *Commonwealth* v. *Lopez*, *supra* at 725, and cases cited.

(b) Contrary to the defendant's contention, the judge did not err in instructing on the relationship between intoxication and consent.[4] Both the Commonwealth and the defendant introduced evidence that the complainant had consumed alcohol in the

---

[4]The judge instructed the jury as follows:

"[I]f by sleep or intoxication or drunkardness [*sic*] or stupefication or unconsciousness or helplessness a person is incapable of consenting, an act of sexual intercourse natural or unnatural as previously defined for you occurring with that person during such incapacity is without the valid consent of the incapacitated person. In such cases, the amount of

hours preceding the alleged sexual assaults. There was also evidence that the complainant had taken one Percocet, and that, during the alleged sexual assaults, she felt "drugged" and unable to act. Her testimony was that, on each occasion, she awoke to find the assaults underway, i.e., the defendant had committed sexual acts on her starting when she was asleep. The defendant testified that, before leaving the night club, it was "pretty obvious" to him that the complainant had been drinking, that her eyes were "glassy" and "bloodshot," and that she was "swaying" when she spoke with him. There was a sufficient evidentiary basis to warrant the instruction. See *Commonwealth* v. *Black*, 50 Mass. App. Ct. 477, 479 (2000), and cases cited.

4. The judgment of conviction on the indictment charging indecent assault and battery on a person over the age of fourteen years is reversed, the verdict is set aside, and the case remanded for a new trial. On the indictment charging assault and battery, the judgment of conviction and sentence imposed thereon are vacated, the verdict is set aside, and the indictment is to be dismissed.

*So ordered.*

---

force required may be only that sufficient to effectuate the act of intercourse."