## COMMONWEALTH *vs.* MARTIN URBAN.

Suffolk. October 1, 2007. - February 8, 2008.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Rape. Practice, Criminal,* Instructions to jury. *Intoxication. Consent.*

INDICTMENTS found and returned in the Superior Court Department on September 13, 2002.

The case was heard by *Elizabeth B. Donovan*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Amanda Lovell*, Assistant District Attorney, for the Commonwealth.

*R. Bradford Bailey* for the defendant.

*Wendy J. Murphy & Judith G. Greenberg*, for Sexual Violence Legal News & another, amici curiae, submitted a brief.

BOTSFORD, J. A jury in the Superior Court convicted the defendant on two indictments charging rape in violation of G. L. c. 265, § 22 (*b*), both involving the same complainant. The Appeals Court reversed the defendant's convictions, concluding that the trial judge's instruction on the complainant's capacity to consent was erroneous and prejudicial. *Commonwealth* v. *Urban*, 67 Mass. App. Ct. 301, 308 (2006). We granted the Commonwealth's application for further appellate review.

On appeal, the defendant has argued primarily that the incapac-
ity instruction given by the judge erroneously implied that any
degree of intoxication would render the complainant legally un-
able to consent, and that the judge's promise of a clearer instruc-
tion than the one actually given induced defense counsel to
concede the fact of intoxication in closing argument. While our
reasoning differs in several respects, we share the Appeals Court's
view that the judge's instruction on intoxication and consent
was erroneous and was likely to have influenced the jury's
verdict; we therefore reverse the defendant's convictions.[1]

1. *Background.* There was evidence from which the jury could
have found the following. The defendant and the complainant
were acquainted through their affiliation with the Harvard School
of Dental Medicine, where the complainant was a dental student
and the defendant was a postdoctoral resident studying peri-
odontics. They first met during the complainant's second year
of school, when both lived in the same student dormitory. In the
complainant's third year of dental school, beginning in the fall
of 2001, the defendant sometimes acted as a supervisor in the
complainant's required clinic sessions, where he was responsible
for checking the work dental students performed on patients.

Beginning in her second year and increasing in her third year,
when the complainant saw the defendant more often in clinic,
the defendant repeatedly asked her to go out with him. The
complainant refused his invitations because she was not in-
terested, but she tried to avoid offending him because he was
her supervisor. In December of 2001, in response to the de-
fendant's once again asking her, "When am I going to see you
drinking?" the complainant told the defendant about a party her
classmates were organizing for a departing faculty member at a
local bar.

On December 20, 2001, the complainant attended this party
with a friend. The complainant was five feet, two inches tall,

[1]In addition to his challenge to the intoxication instruction, the defendant
also challenges on appeal (1) the scope of fresh complaint testimony; (2) al-
legedly improper statements in the prosecutor's closing argument; (3) the
exclusion of certain extrajudicial statements; and (4) the lack of an instruction
on the trial judge's role. We agree with the Appeals Court's disposition of
these additional claims, see *Commonwealth* v. *Urban*, 67 Mass. App. Ct. 301,
301 n.2 (2006), and we do not discuss them further.

weighed 115 pounds, and testified that she "get[s] drunk easily." At the bar, she drank a beer, ate some food, and drank two or three "shots" of alcohol purchased for her by the defendant's roommate, Jay Sison. While they were drinking these shots, Sison called the defendant using his cellular telephone and handed the telephone to the complainant. The defendant said to her, "I can't believe you're out drinking. I'll be there in twenty minutes."

When the defendant arrived at the bar, he went directly to the complainant and bought her a shot. Ultimately the defendant bought three or four shots for the complainant; he was not buying shots for anyone else at the table. After consuming this alcohol, the complainant testified that she felt "[r]eally drunk," "light-headed," and "drowsy." Valerie Woo, a classmate who was also at the party, described the complainant at this point as "highly intoxicated" and "animated." After a while, the party at the bar broke up, and nine people, including the defendant, the complainant, Sison, and Woo, left in two cars to go to the defendant's and Sison's house.

The complainant testified that she only remembered "a few things" about the time she spent at the defendant's house. She went immediately to the couch, where she remained, she said, "in a . . . light sleep" for the entire evening. She did not remember consuming any more alcohol or drugs, although others were drinking and smoking marijuana. Woo, who was sitting next to the complainant on the couch, testified that toward the middle or end of the party, the complainant fell asleep on her shoulder.

When the party wound down, the complainant was still sleeping on Woo's shoulder and was still "really drunk." Because the complainant was unable to stand or walk on her own, Woo put the complainant's arm around Woo's shoulders, helped the complainant out to the defendant's car, and got in the back seat with her. The complainant described her physical condition at that point as not unconscious but "exhausted . . . drunk . . . physically tired . . . sleepy." There was a discussion about who would ride in which car, and Woo wanted Caroline Faris, who was also at the defendant's house, and who lived in the same dormitory as the complainant, to ride with them so that she

could help the complainant up to her room. However, the defendant ultimately drove only the complainant, Woo, and Woo's fiancé home. On the way, the complainant slept on Woo's lap or shoulder, and recalled nothing about the ride except that the defendant received a telephone call.

The defendant dropped off Woo and her fiancé at their apartment. Woo left the complainant lying "all the way across the back seat of the car" sleeping, and told her Faris would be waiting at her dormitory to help her to her room. The complainant heard Woo say this and then went back to sleep; the next thing she remembered was that the car was parked and the defendant was kissing her, which awakened her. The complainant was "in shock," scared, and confused. The defendant pulled her head toward his penis and placed it in her mouth; she tried to pull back and fell back against the seat. The defendant then vaginally raped her and said to her, "You don't know how long I've been waiting for this." The complainant testified that during these events she was "really drunk," had no energy, felt physically paralyzed, said nothing because she was scared, could not move, and was unable to push him off.

The defendant put the complainant's clothes back on and helped her to the front seat, explaining that he did not want Faris "to be suspicious." The defendant drove toward the complainant's dormitory but passed it and parked down the street. He then put his hand down the complainant's pants and put his finger in her vagina while placing her hand on his crotch.

While this was happening, Sison walked up to the car window and told the defendant that Faris was waiting for the complainant at their dormitory. The defendant then drove up to the dormitory, and Faris took the complainant out of the car because she was "helpless" and unable to get out on her own. The complainant told Faris, "[The defendant] eff'd me." Faris helped the complainant into the building and up to her room; took her to the bathroom and removed her contact lenses; took off her shoes; put her into bed fully clothed; and sat with her for about twenty minutes until she fell asleep.

The following day the complainant visited a hospital because she was experiencing pain on urination and had discovered blood in her underwear. The sexual assault nurse and doctor

who examined her testified that the complainant had a tear in her genital area caused by blunt force trauma that was consistent with sexual assault. The complainant did not consent to a sexual assault evidence collection kit.[2]

The judge indicated during the charge conference that, with regard to the complainant's capacity to consent, the judge intended to instruct the jury that they must "make that finding as to whether she was drunk and, if so, what degree of drunkenness or stupefaction or helplessness there was" because "[o]bviously there's different degrees of drunkenness." However, the instruction she ultimately gave on the complainant's possible incapacity to consent did not include any language on degrees of intoxication. The defendant objected at the end of the charge, and the judge promised to clarify, but then decided not to do so.

2. *Instruction on incapacity to consent.* The instruction on incapacity to consent that the judge gave was drawn from Massachusetts Superior Court Criminal Practice Jury Instructions § 2.12.1(b) (Mass. Continuing Legal Educ. 1999 & Supp. 2003). The judge stated:

---

[2]The defendant and his witnesses (primarily Sison and Faris) painted a considerably different picture of the evening's events and the complainant's behavior. They testified that the party left the bar to go to the defendant's house because the complainant stated that she wanted to smoke marijuana. While at the house, the complainant did not sleep but rather shouted out requests for pornography (which Sison obliged by playing a pornographic movie), kissed and fondled Faris under her clothing, and "grabbed [the defendant] by the crotch." Before dropping the complainant at her dormitory, the defendant stopped to check on an experiment in his laboratory. However, when he opened the car's back door to bring the complainant to the front seat to wait for him, she grabbed his wrist and pulled him into the car with her, where they kissed and she voluntarily performed oral sex on him. The defendant testified that they did not have vaginal intercourse but that he did place his finger in the complainant's vagina, both in the back seat and later when they moved to the front seat and parked again. According to the defendant, the complainant was an active and willing participant in the sexual encounter and was in fact "sexually aggressive." Both the defendant and Sison testified that the complainant seemed alert and coherent when Sison walked up to the defendant's car parked near the dormitory, but that moments later when she saw Faris she "became instantaneously drunk and embarrassed" and "began to act incapacitated." The defendant testified that before this time, he had not seen the complainant require any assistance walking that evening. The defendant's expert medical witness, who had reviewed the complainant's medical records and the testimony of the Commonwealth's medical witnesses, testified that her injury could not have been caused by a penis.

"You may consider all of the circumstances and the entire sequence of events in determining whether the intercourse was without the complainant's consent and her ability to resist. If, by reason of sleep, or intoxication, or drunkenness, or stupefication [*sic*], or unconsciousness, or helplessness, a person is incapable of consenting, an act of sexual intercourse occurring with that person during such incapacity, is without the valid consent of the incapacitated person."

The Appeals Court concluded that this instruction failed to make clear that where the Commonwealth seeks to satisfy the element of lack of consent by proof that the complainant lacked the capacity to consent, the jury must find not just that she was intoxicated, but that her degree of intoxication was such that it rendered her incapable of consenting to intercourse. *Commonwealth* v. *Urban*, 67 Mass. App. Ct. 301, 307 (2006). We agree. The Commonwealth may satisfy the required element of lack of consent by proof that the complainant was incapable of consenting, but as we hold today in *Commonwealth* v. *Blache*, *ante* 583 (2008) (*Blache*), to do so the Commonwealth must establish beyond a reasonable doubt that "because of the consumption of drugs or alcohol or for some other reason (for example, sleep, unconsciousness, mental retardation, or helplessness), the complainant was so impaired as to be incapable of consenting to intercourse." *Id.* at 591-592.

The instruction in this case, like the instruction in *Blache*, failed to clarify that an extreme degree of intoxication is required before the incapacity rule will apply. As the Appeals Court noted, "by listing intoxication and drunkenness alongside sleep, stupefaction, unconsciousness, and helplessness as potential bases for a finding of incapacity, the judge created the risk that jurors would equate these conditions, at least as they bear on the question of consent. Needless to say, the latter forms of impairment — sleep, stupefaction, unconsciousness, and helplessness — ordinarily would altogether preclude any possibility of voluntary consent. The jury might have improperly assumed that the law, at least, takes the same view of drunkenness and intoxication."[3] *Commonwealth* v. *Urban*, 67 Mass. App. Ct. at 306. Although it is

---

[3]Although the Appeals Court also focused on the lack of the phrase "wholly insensible" in its conclusion that the instruction did not convey the requisite

possible that jurors might have understood the instruction as requiring them to consider whether the level of intoxication was such that it rendered the complainant incapable, the risk is too great that they may have interpreted it to mean that a finding of intoxication of any degree, like a finding of unconsciousness, for example, vitiates consent as a matter of law.[4]

The defendant objected at trial to the language of the instruction, and thus his claim of error is preserved. We ask whether the erroneous instruction was prejudicial, that is, whether it likely affected the jury's verdict. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983) (error prejudicial unless it "did not influence the jury, or had but very slight effect"). Accord *Commonwealth* v. *Cruz*, 445 Mass. 589, 591 (2005). At trial, the defendant acknowledged at least some of the sexual acts alleged by the complainant, including intercourse. Accordingly, one of the main contested issues was whether the complainant consented, and in particular, whether she had been incapable of consenting. Indeed, in reliance on the judge's promise to instruct the jury that they must find not merely intoxication but intoxication to a degree that rendered the complainant incapable of consenting, the defendant in closing argument conceded that the complainant had been intoxicated. The errors in the instruction ultimately given may have removed the central factual question from the jury's consideration, and it is impossible for us to say with confidence that "the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte, supra,* quoting *Commonwealth* v. *Peruzzi, supra.* The defendant's convictions must be reversed. The case is remanded

degree of impairment, *Commonwealth* v. *Urban*, 67 Mass. App. Ct. at 306, we decide today in *Commonwealth* v. *Blache, ante* 583, 592 (2008) (*Blache*), that this language is potentially confusing and that the standard quoted above is a clearer statement of the law.

[4]While it is true that in *Commonwealth* v. *Moran*, 439 Mass. 482, 490 & n.4 (2003), we found no error in the use of the same model jury instruction at issue here, in that case we considered only the sufficiency of the evidence to warrant an instruction on intoxication and incapacity to consent, and not the language of the instruction itself. See *Commonwealth* v. *Fionda*, 33 Mass. App. Ct. 316, 321, 323 (1992) (finding evidence sufficient to warrant same model instruction, and calling it not an "incorrect statement of the law," without considering challenge to its wording).

to the Superior Court for further proceedings consistent with this opinion.[5,6]

*So ordered.*

SPINA, J. (concurring in part and dissenting in part, with whom Cowin, J., joins). I agree that a new trial is required in this case for the reasons stated by the Appeals Court. *Commonwealth* v. *Urban*, 67 Mass. App. Ct. 301 (2006). The judge failed to instruct that the Commonwealth had to prove the complainant was "wholly insensible" due to intoxication (and sleep) as to be incapable of consenting.

I dissent from that portion of the opinion that reformulates the standard set forth in *Commonwealth* v. *Burke*, 105 Mass. 376 (1870), for reasons stated in my separate opinion in *Commonwealth* v. *Blache*, *ante* 583, 603-607 (2008) (Spina, J., concurring in part and dissenting in part), released today.

---

[5]At trial, the defendant also requested an instruction on general "reasonable and good faith belief" as to the complainant's consent; he has repeated the argument on appeal. As we reaffirmed recently in *Commonwealth* v. *Lopez*, 433 Mass. 722, 727-728 (2001), however, Massachusetts does not require the Commonwealth to prove in every rape case that the defendant lacked a reasonable and good faith belief in the complainant's consent, and we. are not inclined to change this rule at the present time. See *Blache*, *supra* at 599.

[6]As we also hold in *Blache*, *supra* at 594, in order to convict a defendant of rape on a finding that the complainant was incapable of consenting, a jury must also find beyond a reasonable doubt that the defendant knew or should have known of the complainant's incapacity. See *Commonwealth* v. *Burke*, 105 Mass. 376, 380-381 (1870). We have stated that this rule concerning a defendant's entitlement to an instruction on knowledge of incapacity will apply prospectively only. *Blache*, *supra* at 597. On any retrial in this case, if there is again an issue of incapacity to consent, the judge should include an instruction that reflects this requirement. *Blache* includes a proposed instruction. *Id.* at 595 n.19.