NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-889                                              Appeals Court

COMMONWEALTH  vs.  THOMAS TILLSON.

No. 22-P-889.

Bristol.     January 8, 2024. – May 17, 2024.

Present:  Vuono, Wolohojian, & Toone, JJ.[1]


Rape.  Indecent Assault and Battery on a Person with an
    Intellectual Disability.  Consent.  Evidence,
    Authentication, Court record, Admissions and confessions,
    Voluntariness of statement.  Practice, Criminal,
    Voluntariness of statement, Required finding, Motion to
    suppress, Instructions to jury.



Indictments found and returned in the Superior Court
Department on October 18, 2018.

A pretrial motion to suppress evidence was heard by Raffi
N. Yessayan, J., and the cases were tried before Thomas F.
McGuire, Jr., J.


Megan A. Siddall for the defendant.
Robert P. Kidd, Assistant District Attorney, for the
Commonwealth.

_____

[1] Justice Wolohojian participated in the deliberation on
this case and authored this opinion prior to her appointment as
an Associate Justice of the Supreme Judicial Court.

WOLOHOJIAN, J.  After a jury trial, the defendant was convicted of rape, G. L. c. 265, § 22 (b), and indecent assault and battery on a person with an intellectual disability, G. L. c. 265, § 13F.  He raises four arguments on appeal.  First, he argues the evidence was insufficient in two respects.  With respect to all the crimes, he argues that the evidence was insufficient to prove lack of consent -- either as a matter of actual consent or of incapacity to consent.  With respect to the rape charges, he also argues that the evidence was insufficient to prove force.  Second, the defendant argues that a guardianship decree issued by the Probate and Family Court should not have been admitted in evidence because it was not properly authenticated and that the error was prejudicial.  Third, the defendant argues that his statements to police should have been suppressed because they were involuntary.  Fourth, the defendant argues that voluntariness was a live issue at trial such that the judge was required sua sponte to give a humane practice instruction and that the failure to do so resulted in a substantial risk of a miscarriage of justice.  We affirm.

Background.  We recite the facts pertinent to the defendant's arguments regarding the sufficiency of the evidence through the lens of Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979), reserving additional facts for later discussion. The victim was a fifty year old man with developmental deficits.

The victim's mother had been his guardian until she died in 1994. Thereafter, the victim moved in with his brother and sister-in-law, who became his court-appointed permanent guardians in 1995 and, as such, had responsibility to take care of the victim financially and to watch over him.

The victim could not read, and could write only in a limited fashion by copying things. He could spell his name and address. He graduated from high school at the age of twenty-two, after following a curriculum that did not include classes in English or math, but did include archery, basketball, and baseball. After being diagnosed with mild retardation,[2] the victim was determined to be in need of assistance and was provided services by the Department of Mental Retardation (DMR) and later by the Department of Developmental Services.[3] The victim has for decades also received services on a daily basis from an entity called People Incorporated.

---

[2] We use the phrase mental retardation, or variations of it, only in fidelity to the evidence at trial. It is no longer a favored nomenclature. See Commonwealth v. St. Louis, 473 Mass. 350, 358 n.12 (2015).

[3] The Department of Mental Retardation's name was changed to the Department of Developmental Services effective June 30, 2009. See G. L. c. 19B, § 1, as amended through St. 2008, c. 182, §§ 9, 115, and St. 2008, c. 451, §§ 28, 184; M.D. v. Department of Developmental Servs., 83 Mass. App. Ct. 463, 463 n.2 (2013).

In 1999, the brother used half of the proceeds from the sale of the deceased mother's house to purchase a condominium in Fall River for the victim to live in. Although the victim lived in the condominium by himself, he needed significant supports for many aspects of daily life. The victim, for example, could not drive. He was assigned a mentor who would take him shopping, and do other activities with him. One of the mentors lived next door to the victim in an adjoining unit, and helped him shop and cook. Also by way of example, the victim was not capable of safely using an oven. The sister-in-law prepared meals for the victim, which he reheated using a microwave. The brother and sister-in-law called the victim at least once a day, and visited him weekly. The victim needed guidance and reminders to make sure that he had eaten, shaved, cleaned, and brushed his hair.

People Incorporated arranged for the victim to work at a bank, where he watched parked cars and picked up litter. The victim also volunteered at a hospital, where he washed pots and pans in the kitchen. People Incorporated transported the victim to and from his work, and also from the hospital.[4] People Incorporated also provided an afterwork program for the victim.

---

[4] The victim took the bus home until he got lost; thereafter, People Incorporated transported him.

The victim has had a girlfriend, who has a similar disability to his, for almost thirty years since high school. The victim and his girlfriend would go on walks together, or out to dinner, or "things like that."  The two were never left alone together, but instead were accompanied either by a mentor or by the brother and sister-in-law.

The defendant, who is more than ten years older than the victim, lived in the same condominium complex with his wife and son.[5]  Towards the back of the complex, there was a grassy area and a picnic table where the victim, the defendant, and other residents of the complex regularly congregated.  The victim became friendly with the defendant, whom he met through the defendant's son.

One day, the victim had a conversation with the defendant in which the defendant warned him to be careful of ticks.  The defendant and the victim then went into the victim's condominium, where the victim got undressed and the defendant shaved his penis to supposedly check for ticks.  The victim did not ask the defendant to do this; instead, the defendant did it of his own initiative.  The defendant remained clothed during this episode.

---

[5] Although they were not legally married, the defendant had lived for approximately forty years with the woman referred to during the trial as his wife.

On another occasion, the defendant wanted the victim "to do him" or "to give him a blow job." The victim "said no," and that he did not "want to do it." The defendant "wanted me to do it so I wouldn't get in trouble," and the victim complied. The defendant then attempted to put his penis in the victim's "bum." The defendant then forced his penis into the victim's mouth, something the victim did not want to have happen. The defendant then asked the victim to touch the defendant's penis "[t]o see if it will squirt." The defendant also touched the victim's penis by putting his penis together with the victim's penis "[t]o make them squirt" even though the victim did not want to do this. The defendant also touched the victim's penis with his hands. The defendant and the victim were alone when these events took place. The victim did not want to engage in any of these activities, he told the defendant so, and the conduct made him scared.[6] It was the victim's first time engaging in such activity.

While the defendant was in the victim's condominium, the victim tried to alert his mentor to the situation by banging on the wall to see if he could get her attention, but she did not

---

[6] The victim testified that the conduct with the defendant happened four times, although it is not clear whether the victim meant that all of the conduct just recited occurred on each occasion, or whether each act occurred on a different occasion. The ambiguity makes no difference to the issues raised on appeal.

respond. The defendant told the victim not to say anything because the defendant did not want to get into trouble. He also told the victim not to sit at the picnic table anymore.

In 2017 going into 2018, the brother and sister-in-law noticed that the victim looked very sickly, had lost a lot of weight, complained of body aches, was agitated, and was swearing and getting angry at people. This was unusual behavior, and the brother and sister-in-law became concerned that the victim was seriously ill. They took him to the doctor several times, but tests did not reveal any physical ailment.

On the evening of April 13, 2018, the sister-in-law called the victim to see if he had eaten his supper. She noticed that he "wasn't acting right on the phone." The victim was unable to offer a clear explanation as to what was wrong, but said that he could not pick up his pants, that his legs and side were in pain, and that he was sweating. The sister-in-law and brother drove immediately to the victim's condominium and found him sweating in his pajamas. The victim again stated that he did not know what was wrong, and the sister-in-law and brother decided to drive him to the hospital. En route, the victim revealed that the defendant had been hurting him, that the defendant had shaved his penis for ticks, and that the defendant had tried to put his penis in his "bum." The victim said that he had not wanted to engage in sexual activity with the

defendant. When the brother and sister-in-law brought the victim to their home that night, the victim curled up and "cried and cried," a form of expression he had not previously manifested even in moments of deep personal grief such as the loss of his mother.

Ten days later, on April 23, 2018, the defendant voluntarily went to the police station, where he made inculpatory statements during a one-hour interview that was audio-visually recorded. The defendant confirmed the broad details of the victim's account, except that he denied anal penetration. He acknowledged that he had engaged in sexual activity with the victim on approximately six occasions, but said that he stopped when he became uncomfortable with the situation given the victim's intellectual deficits.

The defendant was indicted of one charge of indecent assault and battery on a person with intellectual disability, G. L. c. 265, § 13F (defendant touching victim's penis, victim touching defendant's penis, and victim and defendant touching penises together), and three charges of rape (oral rape victim on defendant, oral rape defendant on victim, and anal intercourse), G. L. c. 265, § 22 (b). At trial, the defense acknowledged that sexual activity had occurred between the defendant and the victim but argued that it was consensual. The jury convicted him of the indecent assault and battery (all

three acts), and the two oral rape charges; he was acquitted of the rape charge alleging anal intercourse.

Discussion.  1.  Sufficiency of evidence.  a.  Lack of consent.  The defendant argues that the Commonwealth failed to prove beyond a reasonable doubt that the victim did not actually consent or was incapable of consent.  Lack of consent is an element of both rape and indecent assault and battery on a person with an intellectual disability.  See G. L. c. 265, § 22 (b);[7] G. L. c. 265, § 13F;[8] Commonwealth v. St. Louis, 473 Mass. 350, 360-361 (2015) (elements of indecent assault and

---

[7] "Whoever has sexual intercourse or unnatural sexual intercourse with a person and compels such person to submit by force and against his will, or compels such person to submit by threat of bodily injury, shall be punished by imprisonment in the state prison for not more than twenty years; and whoever commits a second or subsequent such offense shall be punished by imprisonment in the state prison for life or for any term or years."  G. L. c. 265, § 22 (b).

[8] "Whoever commits an indecent assault and battery on a person with an intellectual disability knowing such person to have an intellectual disability shall for the first offense be punished by imprisonment in the state prison for not less than five years or not more than ten years; and for a second or subsequent offense, by imprisonment in the state prison for not less than ten years.  Except in the case of a conviction for the first offense for violation of this section, the imposition or execution of the sentence shall not be suspended, and no probation or parole shall be granted until the minimum imprisonment herein provided for the offense shall have been served.  This section shall not apply to the commission of an indecent assault and battery by a person with an intellectual disability upon another person with an intellectual disability."  G. L. c. 265, § 13F.

battery on person with intellectual disability); Commonwealth v. Lopez, 433 Mass. 722, 727 (2001) (elements of rape)  "The element of lack of consent in a prosecution for indecent assault and battery is the same as in a prosecution for rape."  St. Louis, 473 Mass. at 361, citing Commonwealth v. LeBlanc, 456 Mass. 135, 138 (2010).  It may be established either by proving that the victim did not actually consent or that the victim did not have the capacity to consent.[9]  See St. Louis, 473 Mass. at 361 n.16 (acknowledging both methods of proving lack of consent for purposes of indecent assault and battery on person with intellectual disability); Commonwealth v. Blache, 450 Mass. 583, 591 (2008) (intellectual disability may be basis of incapacity to consent in rape charge); Commonwealth v. Urban, 450 Mass. 608, 613 (2008) (same).  We examine the totality of the circumstances to determine whether the Commonwealth met its burden of proof as to lack of consent.  See St. Louis, 473 Mass. at 361.  A victim's intellectual disability is among the circumstances to be considered.  See id. at 362.

The evidence in this case was sufficient to prove beyond a reasonable doubt that the victim did not consent to the sexual

---

[9] The Commonwealth pursued both avenues of proof at trial, and the jury were instructed that the Commonwealth could satisfy its obligation to prove lack of consent in either fashion.  The jury returned a general verdict that did not specify the basis for their finding of lack of consent.

conduct with the defendant. The victim testified that he did not want to engage in the conduct and that he told the defendant so. A victim's testimony of facts constituting an element of a charged offense is sufficient, standing alone, if credited by the jury as it was here. See Commonwealth v. Santos, 100 Mass. App. Ct. 1, 3 (2021). There was also abundant circumstantial evidence from which the jury could infer that the victim did not consent. For example, the victim attempted to summon his mentor's help by banging on the wall -- conduct that is inconsistent with a consensual sexual encounter. Moreover, it was the first time the victim had engaged in such sexual conduct, the conduct scared him, and he suffered acute physical and emotional distress as a result of it. See St. Louis, 473 Mass. at 362 (conduct made victim uncomfortable). In addition, the defendant told the victim not to disclose the incidents, something that could be construed to indicate a lack of consent. See id. (defendant told victim to keep incidents secret). The jury could find that the defendant was an authority figure to the victim, both older in age to the victim and (at least in the victim's eyes) able to instruct the victim not to return to the picnic table where he used to socialize. See id. (authority based on age disparity).

The defendant also argues that the evidence was insufficient to prove that the defendant was incapable of

consent.  As the defendant points out, the victim lived on his own for a long time (albeit with daily supports), was capable of holding a job and engaging in volunteer work, had graduated from high school, had a girlfriend, and owned and watched pornographic videos.  The Commonwealth did not present any direct evidence that the victim was incapable of consenting to sexual activity of any kind.  On the other hand, the jury could observe the victim's testimony and assess the scope of his intellectual disability for themselves.  See St. Louis, 473 Mass. at 361; Commonwealth v. Roderick, 411 Mass. 817, 819 (1992); Commonwealth v. Fuller, 66 Mass. App. Ct. 84, 91 (2006).  The transcript shows that the victim's comprehension and manner of expression were limited and idiosyncratic.  The jury could also consider the victim's limitations and his need for daily support, services, and help.  See Fuller, 66 Mass. App. Ct. at 91.  Among other things, the victim could not read, drive, or cook, and he had only a limited ability to write.  Although the victim graduated from high school, he had done so with a modified curriculum that did not include English or math.  See Commonwealth v. Bonds, 445 Mass. 821, 825 (2006) (victim in special needs classes).  He had for decades qualified for services from the Department of Mental Retardation and, subsequently, the Department of Developmental Services.  See Commonwealth v. Aitahmedlamara, 63 Mass. App. Ct. 76, 77 (2005)

(victim eligible to receive DMR services).  The victim's family checked on him daily to make sure he was safe and sound.  It is an open question whether the constellation of facts here were such that a reasonable inference could be drawn that the victim was incapable of consenting to sexual activity of any kind, contrast St. Louis, 473 Mass. at 353, 361 (victim was missing half of her cerebellum, lived with her mother, and had verbal intelligence quotient [IQ] of forty-seven); Bonds, 445 Mass. at 825 (victim "did not have 'normal intellectual capacity,'" "could not hold a steady job," and received special education); Roderick, 411 Mass. at 818 (victim was resident of group home, severely impaired since birth, could not hear or speak, could communicate only by gesture and vocal sounds); Fuller, 66 Mass. App. Ct. at 85-86 (victim incapable of being alone in society, did not graduate from high school, had never worked despite receiving job training for six to seven years, could not drive, and needed assistance for basic life activities); Aitahmedlamara, 63 Mass. App. Ct. at 77 (victim's IQ significantly below threshold required for DMR eligibility, victim required assistance with virtually all basic life skills), or that no expert testimony was required on the point, contrast Bonds, 445 Mass. at 830 n.14 (no expert opinion necessary where mother capable of testifying to victim's mental disease and capacity); Fuller, 66 Mass. App. Ct. at 90-91

(expert opinion not necessary where DMR service provider testified to victim's intellectual capacity and extensive need of assistance); Aitahmedlamara, 63 Mass. App. Ct. at 77 (testimony of DMR service provider regarding victim's IQ level, level of functioning, and need for assistance). See generally Murphy & O'Callaghan, Capacity of adults with intellectual disabilities to consent to sexual relationships, 34 Psychological Med. 1347-1357 (2004).

All that said, because the evidence was sufficient to prove that the victim did not actually consent, we need not consider whether the evidence was also sufficient to prove that he was incapable of consent. Lack of actual consent and incapacity to consent are not alternate theories of the crimes of rape or indecent assault and battery on a person with an intellectual disability. Instead, they are closely-related alternate methods of proving the single element of lack of consent required for both crimes. See Blache, 450 Mass. at 592 (incapacity is alternate way of proving element of lack of consent); Urban, 450 Mass. at 613 (same). As such, even were we to assume that the evidence was insufficient to prove that the victim was incapable of consent due to his intellectual disability, reversal would not result. See Commonwealth v. Santos, 440 Mass. 281, 289 (2003), overruled on other grounds by Commonwealth v. Anderson, 461 Mass. 616, 633, cert. denied, 568 U.S. 946 (2012);

Commonwealth v. Inoa, 97 Mass. App. Ct. 262, 264 (2020);
Commonwealth v. Oquendo, 83 Mass. App. Ct. 190, 193-194 (2013).
We, therefore, need not and do not consider whether the evidence
of incapacity was sufficient.

b. Force. In addition to arguing that the Commonwealth
failed to prove lack of consent, the defendant argues that the
Commonwealth failed to prove force. Unless the victim was
incapable of consent (a theory we do not consider for the
reasons set out above),[10] the Commonwealth was required to prove
that the "the defendant compelled the victim's submission by use
of physical force; nonphysical, constructive force; or threat of
force." Lopez, 433 Mass. at 728-729.

For essentially the same reasons already given in our
discussion of the evidence bearing on the victim's lack of
consent, the evidence of force was sufficient. To begin with,
there was direct evidence that the defendant forced his penis in
the victim's mouth. In addition, a combination of physical and
constructive force could be reasonably inferred from the
victim's attempt to summon aid by banging on the wall to summon

---

[10] In cases where the Commonwealth proves that the victim
was incapable of consenting by reason of intellectual
incapacity, proof of force may not be necessary. See
Commonwealth v. Eldridge, 28 Mass. App. Ct. 936, 937 (1990)
(incapacity to consent by reason of intellectual disability "may
permit a jury, with proper instruction, validly to conclude that
the force necessary to effect the intercourse is sufficient to
constitute the force element of the crime of rape").

his mentor, his physical and emotional reaction to the defendant's sexual conduct, see Commonwealth v. Molle, 56 Mass. App. Ct. 621, 627 (2002) (victim sobbing and shaking), the fact that the victim could perceive the defendant as an authority figure, see Commonwealth v. Testa, 102 Mass. App. Ct. 149, 152 (2023), and the victim's testimony that he was scared.

2.  Authentication.  The Commonwealth was permitted to introduce, through the testimony of the victim's brother, an unattested-to copy of a 1995 decree of the Probate and Family Court appointing the brother and sister-in-law as the victim's guardians.  The decree reflected a Probate and Family Court judge's finding that the victim was "mentally retarded to the degree that he is incapable of making informed decisions with respect to his -- personal -- financial affairs and that the failure to appoint a guardian would create an unreasonable risk to the [victim's] health, welfare and property."  The defendant timely preserved an objection to the authenticity of the decree on the ground the document was neither an original nor an attested-to copy.  The defendant did not, however, raise a hearsay objection.

On appeal, the defendant argues that the decree should not have been admitted because it failed to satisfy the authentication requirements of G. L. c. 233, § 76.  That statute provides that, with certain exceptions, "[c]opies of books,

papers, documents and records <u>in any department of the</u> <u>commonwealth or of any city or town</u>, authenticated by the attestation of the officer who has charge of the same, shall be competent evidence in all cases equally with the originals thereof" (emphasis added).  On its face, section 76 does not appear to apply to court records because courts are not departments of the Commonwealth nor of any city or town.  See <u>Attorney General</u> v. <u>Ware</u>, 328 Mass. 18, 23-24 (1951) (school committee records); <u>Grover</u> v. <u>Smead</u>, 295 Mass. 11, 14 (1936) (registry of motor vehicles records); <u>Commonwealth</u> v. <u>Martinez-</u> <u>Guzman</u>, 76 Mass. App. Ct. 167, 171 n.3 (2010) (same); <u>Commonwealth</u> v. <u>Dias</u>, 14 Mass. App. Ct. 560, 564 (1982) (same). But see <u>Ux</u> v. <u>North Reading</u>, 379 Mass. 914, 915 (1979) (Federal agency maps); <u>Commonwealth</u> v. <u>Cuevas</u>, 87 Mass. App. Ct. 205, 207 (2015) (out-of-State conviction); <u>Commonwealth</u> v. <u>Ellis</u>, 79 Mass. App. Ct. 330, 332-333 (2011) (record of convictions); <u>Commonwealth</u> v. <u>Crapps</u>, 64 Mass. App. Ct. 915, 916 (2005) (rescript) (record of conviction).  Setting that issue to the side, under Mass. R. Crim. P. 40 (a) (1),[11] the decree should have been authenticated in order for its contents to have been

---

[11] "An official record kept within the Commonwealth, or an entry therein, when admissible for any purpose, may be evidenced by an official publication thereof or by a copy attested by the officer having legal custody of the record, or by his deputy." Mass. R. Crim. P. 40 (a) (1).

admitted for their truth, a matter the Commonwealth concedes on appeal. See Mass. G. Evid. § 902(b) (2023).

Although the judge erred in admitting the unauthenticated decree, the defendant was not prejudiced because the contents of the decree essentially duplicated the victim's brother's unobjected-to testimony on all essential points. Specifically, the brother testified that the victim had at one time been diagnosed as "mildly retarded," that he and his wife were court-appointed guardians of the victim, and that, as such, they took care of the victim's financial and other wellbeing. See Commonwealth v. Deramo, 436 Mass. 40, 49 (2002) (erroneous admission of unauthenticated document reviewed for prejudice where error preserved). Although it is true that the brother did not testify that the Probate and Family Court judge made a finding that the victim was "mentally retarded," the brother testified that the victim had been "diagnosed" with "mental retardation" and there is no reason to think that the jury would have given greater weight to a judge's finding than to that of a person equipped to make a diagnosis.

The defendant also correctly argues that the contents of the decree were inadmissible hearsay. "The fact that a document is authentic as an official record does not mean that the document is admissible under the official or public records exception to the hearsay rule." Commonwealth v. Shangkuan, 78

Mass. App. Ct. 827, 830 (2011). But this argument, which we review under the less demanding standard for unpreserved errors, see Commonwealth v. Keevan, 400 Mass. 557, 562 (1987), is of no more help to the defendant for the same reason we have just given. See Commonwealth v. O'Connor, 407 Mass. 663, 670 (1990) ("mistaken admission of hearsay evidence, if merely cumulative of another witness's testimony, does not constitute reversible error").

3. Motion to suppress. Voluntariness. The defendant's motion to suppress his statements to police was accompanied by an affidavit of trial counsel stating that the defendant had graduated from high school when he was almost twenty years old, having apparently repeated first and fourth grades. Counsel also averred that the defendant was unemployed, received social security disability benefits, and had "blatantly obvious mobility issues." The affidavit concluded that "[i]t would appear almost axiomatic that the [d]efendant did not understand the significance of waiving his rights."

The motion judge conducted an evidentiary hearing on the motion at which one of the officers who interviewed the defendant testified, and the videotape of the interview was introduced and played. Ultimately, the judge denied the motion on the grounds that (1) the interview was not custodial; (2) the defendant voluntarily waived his Miranda rights; and (3) the

defendant's statements were voluntary.  Although the defendant had not directly raised the issue, the judge also considered whether the officers had used improper interrogation techniques, such as minimizing the seriousness of the situation or offering the defendant leniency, such that the defendant's will was overborne, and the judge concluded that they had not.

On appeal, the defendant challenges only the judge's conclusion regarding voluntariness, arguing that the police used impermissible interrogation tactics to overbear the defendant's will and render his statements involuntary.  Specifically, the defendant contends that the police misled him by stating at the outset of the interview, "All right, so like I said, you're not in any trouble.  You're free to leave whenever you want.  Just going to have a conversation," when, in fact, the police already had spoken with the district attorney's office and knew the district attorney wished to press charges.  The defendant also argues that the officers suggested to him that he would be helping himself if he admitted to consensual activity with the victim.  He points specifically to an officer's question, "If this were to go to court and come out and say the district attorney wanted to prosecute a case like this, wouldn't you want something to be seen, as like you said, consenting opposed to forcible or coercion?" and to a later statement that, "You need

to help us understand.  You also need to help yourself out."[12] None of the defendant's current arguments were specifically raised in connection with the motion to suppress and they are, accordingly, waived.  See Commonwealth v. Quint Q., 84 Mass. App. Ct. 507, 514 (2013).  Nonetheless, because the motion judge on his own identified and reached the question of whether the officers' interrogation tactics overbore the defendant's will, we do as well.

"The test for voluntariness is whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act" (quotation and citation omitted).  Commonwealth v. Lopez, 485 Mass. 471, 482 (2020).  "Relevant factors include, but are not limited to, promises or other inducements, conduct of the

---

[12] The defendant also argues that the officers' statement that he "forced it on [the victim] because of his mental capability" led directly to the defendant's admission to nonforcible sexual contact.  This argument, however, is based on a mischaracterization of the record.  In fact, the defendant appears to have been referring to statements by people other than the officers:

[DEFENDANT]:  "Everybody is saying I forced it on him because of his mental capability.  They're saying (indecipherable)."

[OFFICER]:  "Well, that's not what we're saying.  We want to know whether or not somebody was forced into doing something forcibly.  Or did two people get together and decide to experiment or do something?"

defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings" (quotation and citations omitted).  Id.

In the totality of the circumstances presented here, including our own review of the videotape of the interview, we see no error in the judge's conclusion that the defendant's will was not overborne.  The defendant drove himself voluntarily to the station after officers asked him whether he would be willing to speak with them about an investigation.  He was interviewed for approximately one hour, and the entire interview was conducted in an informal manner with a cordial tone.  The defendant was not threatened or intimidated in any way by the officers.  At the outset of the interview, the defendant was told he was free to leave at any time and that he was not under arrest.  The defendant was properly advised of his Miranda rights, stated he understood them, and signed a waiver form that clearly set out those warnings.  The judge found that the video showed no evidence that the defendant had any intellectual limitations, and showed that the defendant understood his Miranda rights.  The judge further found:

"Although the defendant did not appear to be highly educated, he did appear to have a clear mind, a sound mind, and to be fully aware of what was going on around him. He appeared to understand every question that was asked of him and responded appropriately to the questions. Although the defendant had no prior experience with the criminal justice system, there was nothing to indicate he did not understand the Miranda rights as they were being read to him. In addition, the defendant could be observed on the video as he read along with the detective while he was being read his rights. The police made no promises or inducements to the defendant. His discussion with the police was calm and cordial. His will was not overborne. He did not display slurred speech, nor was he swaying or nodding off during the interview. There is nothing on the recording to indicate that the defendant was in any way affected by the consumption of drugs or alcohol."

At the end of the interview, the defendant was allowed to leave.

Considering the totality of the circumstances, although the police occasionally used questioning techniques designed to put the defendant at ease or to let down his guard, they were not of such quality or quantity as can be said to have affected the voluntariness of his statement. See Lopez, 485 Mass. at 380; Commonwealth v. Tremblay, 460 Mass. 199, 208 (2011) (deception alone will not ordinarily result in suppression). This is not a case of psychological coercion such as Commonwealth v. Monroe, 472 Mass. 461, 469 (2015), or where minimization is tied to an implication of leniency, such as Commonwealth v. DiGiambattista, 442 Mass. 423, 435-436 (2004), or to an assurance that the statements would not be used against the defendant, such as Commonwealth v. Baye, 462 Mass. 246, 258 (2012).

4.  Humane practice instruction.  The defendant did not request a humane practice instruction at trial, but now argues that the trial judge (who was not the motion judge) erred by failing to give one sua sponte.  "If the defendant does not raise the issue of voluntariness, the judge has a sua sponte obligation to conduct a voir dire only if the voluntariness of the statements is a live issue such that there is evidence of a substantial claim of involuntariness."  Commonwealth v. Bohigian, 486 Mass. 209, 219-220 (2020), quoting Commonwealth v. Brown 449 Mass. 747, 765 (2007).  If the judge concludes that there is such evidence and that the defendant's statements were voluntary, then the judge must give a humane practice instruction and submit the question of voluntariness to the jury.

There is no bright-line test to determine whether voluntariness was a live issue at trial.  See Commonwealth v. Pavao, 46 Mass. App. Ct. 271, 274-275 (1999) ("Cases which address whether the voluntariness of a defendant's statements was a live issue at trial consistently have failed to adopt any per se rule that if certain factors are present, voluntariness is a live issue").  For voluntariness to be considered a "live issue," "substantial evidence of involuntariness [must be] produced."  Commonwealth v. Gallett, 481 Mass. 662, 686 (2019).

Here, the defendant moved in limine to exclude the videotape on the ground that the defendant's admissions were involuntary because he was not informed that he would be charged. This was sufficient to make voluntariness a "live issue" and, indeed, the judge himself understood that to be the case. The judge took the steps necessary to conduct a voir dire into the evidence bearing on voluntariness by asking for a copy of the videotape so that "if there's any indication of involuntariness, if that's a live issue, then it will have to be submitted to the jury." The parties agreed to submit the videotape after they worked out certain excisions. The following day -- after the trial judge had viewed the videotape -- the judge stated that the only concern he saw was with those portions where the police expressed their personal opinions regarding who was telling the truth. The judge then ruled on certain excisions to the videotape based on that concern and certain others. The judge did not make an explicit ruling regarding the voluntariness of the defendant's statements. But, in light of the trial judge's remark the preceding day that he would review the videotape for that purpose and the judge's statement that he noted no concern with the videotape apart from the officers' expressions about who they believed, it is reasonable to infer that the trial judge concluded that the videotape showed no substantial evidence of involuntariness -- a

conclusion that is consistent with our own review of the videotape.

Defense counsel indirectly continued to keep voluntariness a live issue during the trial.  When the Commonwealth sought to introduce the videotape during the officer's testimony, the defendant renewed his objection to its introduction on the same grounds raised in his motion to suppress.  In addition, defense counsel's cross-examination of one of the officers who conducted the interview focused on the fact that the defendant was not told until the end of the interview that he would be charged, and that he was told that consenting adults can agree to sexual conduct.  We understand these lines of examination to have been designed to lay a foundation for an argument that the defendant was lulled into making admissions he might otherwise not have made.  Along those same lines, defense counsel pointed out in closing argument that the defendant did not admit to any of the alleged conduct until the police reassured him that he would not be in trouble, and he became more comfortable.  That said, the primary theme of the closing was that the victim was both capable of consenting to sexual contact with the defendant and, in fact, did so consent.  And at no time did defense counsel explicitly state or argue that the defendant's admissions to police were not voluntarily made.  Nor did the defendant ever request a humane practice instruction.

Where, as here, voluntariness is a live issue at trial, and "a judge determines that a defendant's inculpatory statements are voluntary, 'the judge must instruct the jury that the Commonwealth has the burden of proving beyond a reasonable doubt that the statement was voluntary and that the jurors must disregard the statement unless the Commonwealth has met its burden.'" Commonwealth v. Richards, 485 Mass. 896, 912 (2020), quoting Commonwealth v. Tavares, 385 Mass. 140, 152, cert. denied 457 U.S. 1137 (1982).  No such instruction was given in this case, but we conclude that the error did not result in a substantial risk of a miscarriage of justice.  See Richards, 485 Mass. at 914.  To begin with, the evidence of involuntariness was not of the type or magnitude that our cases have found results in a substantial risk of a miscarriage of justice from the absence of a humane practice instruction.  See Bohigian, 486 Mass. at 220 (defendant questioned while having head injury and visible signs of head wound, lethargy, and being "not fine" during questioning).  Nor is this a case involving coercive questioning or force; instead, the claim of involuntariness rested on the notion that the defendant let his guard down after he had been reassured by police and felt comfortable with them. As we have already noted, the entire interview was conducted in an informal manner with a cordial tone, the defendant was free to leave at any time, he was properly advised of his Miranda

rights and stated he understood them, he appeared to be in no distress, and he appeared to understand every question and to be able to think through freely how to respond.  Based on our own review of the videotape of the defendant's interview by police, we conclude that there is no serious risk that the jury, had it received a humane practice instruction, "would have concluded [from the videotape] that the Commonwealth failed to meet its burden of proving that the defendant's statements to police were voluntary and therefore disregarded them."  Richards, 485 Mass. at 914.

Conclusion.  For the reasons set forth above, the defendant's convictions are affirmed.

So ordered.